STATE of Wisconsin, Plaintiff-Respondent,

v.

Terry GRIFFITH, Defendant-Appellant-Petitioner.

Supreme Court

*No. 98–0931–CR. Oral argument April 7, 2000.——Decided June 28, 2000.*

**2000 WI 72**

(Also reported in 613 N.W.2d 72.)

For the defendant-appellant-petitioner there were briefs by *Paul G. LaZotte* and the *Frank Remington Center*, Madison, and oral argument by *Paul G. LaZotte*.

For the plaintiff-respondent the cause was argued by *Paul Lundsten*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

¶ 1. JON P. WILCOX, J.   Terry Griffith petitions for review of a decision of the court of appeals affirming his convictions for obstructing an officer, possession of marijuana, and escape from custody. Griffith was convicted in the Circuit Court for Racine County, Emmanuel J. Vuvunas, Judge. On appeal, Griffith

argues that the police questioning that led to the obstruction charge constituted an unreasonable search or seizure. Griffith contends that all of his convictions should therefore be reversed.

¶ 2. Griffith was convicted for obstructing an officer after he gave a police officer false information during a traffic stop. Griffith was arrested at the scene of the traffic stop, but he escaped from the officers and fled from the scene. He was later identified as the escaped passenger and was apprehended.

¶ 3. At his trial, Griffith presented a defense of mistaken identity, arguing that he was not the passenger who fled from police. The jury found Griffith guilty.

¶ 4. In a postconviction motion, Griffith argued that he did not receive effective assistance of counsel because his trial attorney failed to raise a Fourth Amendment argument. Griffith's claim is that under the Fourth Amendment and Wis. Const. art. I, § 11, the officer lacked lawful authority to ask the passenger his name and date of birth. If the officer lacked lawful authority to pose these questions to the passenger, then the passenger did not violate Wis. Stat. § 946.41(1)(1995–96),[1] obstructing an officer.[2] If the passenger was not subject to a legal arrest, then the marijuana was not discovered during a lawful search incident to arrest. In addition, if the passenger was never legally arrested, then he did not "escape" from

---

[1] All references to the Wisconsin Statutes are to the 1995–96 statutes unless otherwise indicated.

[2] Wisconsin Stat. § 946.41 provides in relevant part:

(1) Whoever knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority, is guilty of a Class A misdemeanor.

(2) In this section:

(a) "Obstructs" includes without limitation knowingly giving false information to the officer. . . .

legal arrest in violation of Wis. Stat. § 946.42(3)(a).[3] In sum, Griffith contends that because the officer lacked lawful authority to ask his name and date of birth, all of his convictions must fail.

¶ 5.   The circuit court rejected Griffith's argument. The court determined that Griffith's Fourth Amendment argument was without merit and that failure to raise a meritless argument did not constitute ineffective assistance of counsel. The court of appeals affirmed, and Griffith petitioned for review.

¶ 6.   We agree with the circuit court and the court of appeals that Griffith's Fourth Amendment argument fails on the merits.[4] Asking the passenger his name and date of birth during a lawful traffic stop was not an unreasonable search or seizure in violation of the Fourth Amendment. We therefore affirm.

---

[3] Wisconsin Stat. § 946.42(3)(a) provides:

(3)   A person in custody who intentionally escapes from custody under any of the following circumstances is guilty of a Class D felony:

(a)   Pursuant to a legal arrest for, lawfully charged with or convicted of or sentenced for a crime.

[4] In opposition to Griffith's petition for review, the State argued that because Griffith's trial counsel did not raise a Fourth Amendment challenge, he has waived the issue and his challenge can only succeed as a Sixth Amendment ineffective assistance of counsel claim. *See State v. Erickson*, 227 Wis. 2d 758, 766, 596 N.W.2d 749 (1999). In its brief and argument before this court, the State reiterates this contention. However, having accepted Griffith's petition for review, we exercise our discretion to decide his Fourth Amendment challenge on the merits.

# I

¶ 7.   Because Griffith's trial counsel did not raise any Fourth Amendment challenge, no suppression hearing took place in this case. Griffith also did not attempt to establish additional facts surrounding the traffic stop at his postconviction hearing. Thus, the only record of the events surrounding the traffic stop and the questioning of the passenger were established through testimony at Griffith's trial. The facts established at the trial are as follows.

¶ 8.   On November 19, 1996, Investigators Bruce Larrabee and William Warmington were on patrol in the city of Racine. Larrabee and Warmington were detectives in the Street Crimes Unit of the Racine Police Department. They patrolled in an undercover car and wore plainclothes. Larrabee was driving.

¶ 9.   Warmington noticed a white Pontiac Bonneville with Illinois plates. Warmington knew that the Bonneville belonged to Tyrone Malone and that Malone did not possess a valid driver's license. The Bonneville was parked with the engine running, and Warmington thought he saw Malone in the driver's seat. The detectives therefore called for another Street Crimes Unit detective, intending to stop the Bonneville when it left the area. Investigator Geller answered the call and said he would respond.

¶ 10.   While Warmington and Larrabee were waiting for Geller, the Bonneville began moving. Warmington and Larrabee followed the car and radioed headquarters for a marked squad car to pull it over. Before the marked squad car arrived the Bonneville pulled into an apartment building parking lot and stopped. The detectives pulled in behind the Bonneville, blocked the exit, and approached the car, showing their badges.

¶ 11.   As Warmington and Larrabee approached, Malone started to exit the car through the front passenger side door. Warmington ordered Malone and all the other occupants of the car to remain inside the vehicle. Investigator Geller and two uniformed patrol officers in marked squad cars soon arrived. Geller and the patrol officers stood behind the Bonneville while Larrabee and Warmington contacted the occupants of the car.

¶ 12.   Larrabee went to the driver's side of the car, while Warmington went to the passenger's side. Warmington began speaking to Malone, who was sitting in the front passenger seat. While speaking to Malone, Warmington looked over at the driver and recognized him as Damien Robinson. He asked Robinson when he had obtained a driver's license. Robinson replied that he had "lost them."

¶ 13.   At some point, apparently shortly after he spoke to Robinson, Warmington also noticed a third person in the vehicle, sitting behind Robinson. Warmington thought he recognized the passenger's face but could not remember his name. Warmington's testimony about what happened next was as follows:

Q   Did you ask the rear passenger for any identification?

A   Yes, I did.

Q   What occurred then?

A   He did not have any identification. I asked him for his name, [he] stated his last name was Stevenson. I asked him to spell it. He spelled it Steven, S-T-E-V-E-N. I asked him for his first name. He gave me the name of Rick. I asked him for a date of birth. He gave me a date of birth. . .At that time I asked him okay, how old are you. He stated he was 22. The

54

date of birth that he provided would have made him 23.

. . . .

Q   What happened next then?

A   At that up point [sic] in time, I confirmed the information he had given me. I then—

Q   When you say you confirmed the information?
A   I asked him again to repeat the date of birth and how old he was. I then stepped back away from the car and said over the roof to Investigator Larrabee, who was on the driver's side, and advised him to remove the rear passenger from the left side, that the party was to be handcuffed, as the party was providing us with false information.

Larrabee removed the rear passenger from the Bonneville and placed him under arrest. While Larrabee was putting handcuffs on the passenger, the passenger made a move as if he was going to try to run. Larrabee then brought the passenger to the back of the vehicle near the other officers.

¶ 14.   Warmington continued with the traffic stop. He asked Malone and Robinson for permission to search the car. They consented to the search. While Warmington conducted a consensual search of the car, Geller began conducting a search of the passenger incident to his arrest. During this search, Geller found marijuana inside a crumpled tissue in the passenger's front jacket pocket. Geller looked up at the passenger and said, "What do we have here?" The handcuffed passenger immediately bolted from the scene. Geller and the other officers failed to apprehend him.

¶ 15. On December 5, 1996, a confidential informant identified Terry Griffith[5] as the passenger who fled from the scene of the traffic stop. The police arrested Griffith at his sister's apartment on that date. Authorities later learned that Griffith had been an escapee from Kenosha Correctional Center since May 17, 1996.

¶ 16. Griffith was charged with four offenses: (1) knowingly obstructing an officer while the officer was acting with lawful authority, in violation of Wis. Stat. § 946.41(1), as a habitual offender; (2) possession of a controlled substance, in violation of Wis. Stat. §§ 961.41(3g)(e)[6] and 961.14(4)(t),[7] as a habitual offender; (3) escape from custody after a legal arrest, in violation of Wis. Stat. § 946.42(3)(a);[8] and (4) theft of the handcuffs, in violation of Wis. Stat. § 943.20(1)(a), as a habitual offender. Griffith pleaded not guilty to all of these charges.

¶ 17. At Griffith's trial, the prosecution presented the testimony of several officers identifying Griffith as the rear passenger in the Bonneville. The prosecution also presented evidence that Griffith had

---

[5] The informant actually gave the name "Terry Griffin," but Terry Griffith and Terry Griffin were identified as the same person in the police computer.

[6] Wisconsin Stat. § 961.41(3g) subsequently has been amended by 1999 Wis. Act 21, § 2; 1997 Wis. Act 183, § 45; and 1997 Wis. Act 220. However, none of these amendments affects § 961.41(3g)(e).

[7] 1999 Wis. Act 21, § 1 amended § 961.14. This amendment does not affect § 961.14(4)(t).

[8] Wisconsin Stat. § 946.42 subsequently has been amended by 1999 Wis. Act 9, 1997 Wis. Act 283, and 1997 Wis. Act 35. None of these amendments affects § 946.42(3)(a) as it applies to Griffith's case.

escaped from Kenosha Correctional Center on May 17, 1996. Griffith presented a defense of mistaken identity, arguing that he was not the rear passenger. With regard to the theft charge, Griffith argued that whoever took the handcuffs did not do so with the intent to permanently deprive the officer of them.

¶ 18. On June 11, 1997, the jury convicted Griffith on the first three charges but acquitted him of the theft charge. The circuit court sentenced Griffith to one year for obstructing an officer, one year for possession of marijuana, and five years for escaping from the lawful arrest. Each of these sentences was consecutive to the others and consecutive to the sentence that Griffith was serving at Kenosha Correctional Center before he escaped from that facility.

¶ 19. Griffith sought postconviction relief on the basis that he had received ineffective assistance of counsel. Griffith contended that his trial attorney should have raised a Fourth Amendment challenge to Officer Warmington's authority to ask the passenger his name and date of birth. According to Griffith, once Robinson admitted he did not possess a valid driver's license, the investigation of suspected illegal activity was complete and Warmington had no lawful authority to ask these identification questions. Griffith claimed that his trial counsel's failure to pursue this argument deprived him of the effective assistance of counsel.

¶ 20. At the hearing on Griffith's postconviction motion, Griffith's trial attorney testified that she did not pursue this argument because she thought it lacked merit. Judge Vuvunas agreed and indicated that even if the attorney had raised this argument, it would have been rejected. The judge determined that trial counsel's performance therefore was not deficient.

¶ 21. Griffith appealed. The court of appeals first examined whether trial counsel was ineffective in failing to challenge Warmington's lawful authority to ask the identification questions. The court agreed with the circuit court that the argument was without merit. The court then considered whether falsely answering identification questions constitutes a violation of Wis. Stat. § 946.41(1). The court stated that Wisconsin law was not settled on this point, and that failing to raise an unsettled point of law could not constitute ineffective assistance of counsel under *State v. McMahon*, 186 Wis. 2d 68, 84, 519 N.W.2d 621 (Ct. App. 1994). The court therefore affirmed Griffith's convictions.

¶ 22. This court accepted Griffith's petition for review.

## II

¶ 23. The question whether police conduct violated the constitutional guarantee against unreasonable searches and seizures is a question of constitutional fact. *State v. Kieffer*, 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998). When a Fourth Amendment challenge is raised at the trial court level, the trial court considers the evidence, makes findings of evidentiary or historical fact, and then resolves the issue by applying constitutional principles to those historical facts. *State v. Martwick*, 2000 WI 5, ¶¶ 16–17, 231 Wis. 2d 801, 604 N.W.2d 552. On review, this court gives deference to the trial court's findings of evidentiary or historical fact, but determines the question of constitutional fact independently. *Id.* at ¶ 18; *Kieffer*, 217 Wis. 2d at 541.

¶ 24. Because no Fourth Amendment issue was raised at the trial court level, there was no suppression motion at which the trial court considered the evidence

of what occurred during the traffic stop and made findings of fact. However, the parties agree that the trial testimony provides a sufficient record of the evidentiary facts surrounding the traffic stop, and there is no dispute of material fact.[9] We therefore accept the evidentiary facts established in the trial testimony. We independently determine whether under these facts the questioning of the back seat passenger violated the Fourth Amendment and art. I, § 11 of the Wisconsin Constitution.[10]

## III

¶ 25. The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause. . . ." Article I, § 11 of the Wisconsin Constitution provides a nearly identical

---

[9] Griffith disputes the jury's finding that he was the rear passenger in the Bonneville. However, this fact is not material to the issue Griffith raises on appeal. Griffith argues that even if he was the rear passenger, his obstructing charge is invalid because police lacked lawful authority to ask identification questions.

[10] Although Griffith mentions art. I, § 11, his argument is essentially based on the Fourth Amendment and the decisions of the United States Supreme Court. He cites only one Wisconsin case, *State v. Harris*, 206 Wis. 2d 243, 557 N.W.2d 245 (1996). In considering Griffith's arguments, we therefore refer primarily to decisions of the United States Supreme Court. However, our holding also applies to art. I, § 11, because this court consistently follows the United States Supreme Court's interpretation of the Fourth Amendment when construing the related provisions of Wisconsin's constitution. *State v. Kiper*, 193 Wis. 2d 69, 80, 532 N.W.2d 698 (1995).

guarantee against unreasonable searches and seizures. Griffith argues that Investigator Warmington committed an unreasonable search or seizure in violation of the Fourth· Amendment and art. I, § 11 when he asked the back seat passenger his name and date of birth during the traffic stop.

¶ 26. Police conduct that is not subject to the requirements of the Warrant Clause of the Fourth Amendment is tested under the Fourth Amendment's general prohibition against unreasonable searches and seizures. *Terry v. Ohio.* 392 U.S. 1, 20 (1968). To determine whether a search or seizure is "unreasonable," the court first determines whether the initial interference with an individual's liberty was justified, and then considers whether subsequent police conduct was reasonably related in scope to the circumstances that justified the initial interference. *Id.* at 19–20.

¶ 27. Griffith concedes that the initial interference with his liberty was justified in this case. He acknowledges that the police acted with lawful authority when they blocked the Bonneville from exiting the driveway of the apartment complex, and that a lawful stop of a vehicle is lawful as to any occupant of the vehicle. *State v. Harris,* 206 Wis. 2d 243, 260, 557 N.W.2d 245 (1996). He also does not challenge the officers' lawful authority to order the occupants of the Bonneville to remain inside the car as the officers approached. *See Maryland v. Wilson,* 519 U.S. 408, 414–15 (1997)(holding that for safety reasons an officer making a traffic stop may order passengers to get out of a car). In short, Griffith concedes that he was lawfully seized when the officers stopped the Bonneville and ordered the occupants to remain in the car.

¶ 28. Griffith's argument is that this lawful seizure became unlawful when, having already determined that the driver had no valid license, Warmington asked the rear passenger his name and date of birth. According to Griffith, these identification questions were "nonconsensual," because a reasonable person in the position of the passenger would not have felt free to disregard the officer's questions. Griffith contends that under these circumstances, the identification questions transformed the reasonable, lawful seizure into an unreasonable, unlawful seizure.

¶ 29. In support of his argument, Griffith relies primarily on *Brown v. Texas*, 443 U.S. 47, 52–53 (1979). We begin our consideration of Griffith's claim by examining *Brown* to determine whether its holding controls Griffith's case.

¶ 30. In *Brown*, police officers in El Paso, Texas, were patrolling an area that was known to have a high incidence of drug traffic. *Id.* at 48–49. They observed two men walking away from one another in an alley at 12:45 in the afternoon. *Id.* at 48. The officers believed that the men had been together or were about to meet before the patrol car appeared. *Id.* The officers entered the alley and asked one of the men to explain what he was doing in the alley. *Id.* at 48–49. The man refused to answer their questions and said that the officers had no right to stop him. *Id.* at 49. The police frisked him but discovered nothing. *Id.* Nonetheless, the officers arrested the man for violating a Texas statute that stated that " '[a] person commits an offense if he intentionally refuses to report or gives a false report of his name and residence address to a peace officer who has lawfully stopped him and requested the information.' " *Id.* at 49 (citing 1974 Tex. Crim. Stat. § 38.02(a)). The State of Texas argued that the officers were justified in

stopping the defendant based on a reasonable, articulable suspicion that some crime had just taken place or was about to take place. *Id.* at 51.

¶ 31. The Supreme Court rejected the State's argument. The Court determined that none of the circumstances gave rise to any reasonable suspicion that the defendant was involved in criminal conduct. *Id.* at 51–52. The Court therefore held that the application of the statute to the defendant under the circumstances "violated the Fourth Amendment because the officers lacked any reasonable suspicion to believe appellant was engaged or had engaged in criminal conduct." *Id.* at 53.

¶ 32. Griffith contends that the holding in *Brown* applies to his case. He argues that under *Brown* he cannot be punished for giving false answers in response to identification questions during the traffic stop, because the officers had already established that the suspected crime had occurred and they had no reasonable suspicion that the back seat passenger had done anything wrong.

¶ 33. We cannot agree. The crucial factor in *Brown* was that the defendant was never lawfully stopped. Griffith, in contrast, was lawfully stopped as a passenger in a car that police suspected was being driven without a valid license. Thus, Griffith's reliance on *Brown* is misplaced because unlike the defendant in *Brown*, Griffith was the subject of an initially lawful stop.

¶ 34. Griffith's challenge is more analogous to a secondary issue in *Brown*: "whether an individual may be punished for refusing to identify himself in the context of a lawful investigatory stop which satisfies Fourth Amendment requirements." *Id.* at 53 n.3. However, this issue is not precisely the same as the issue in

Griffith's case, because Griffith did not refuse to identify himself; he gave false information. In any case, *Brown* did not answer this secondary question. Having determined that no lawful investigatory stop took place, the Supreme Court in *Brown* expressly declined to decide this issue. *Id.*

¶ 35.   Griffith also claims that the questioning in his case was unlawful under Wis. Stat. § 968.24. Section 968.24 authorizes a law enforcement officer to stop a person when the officer reasonably suspects the person is involved in criminal activity. Griffith notes that § 968.24 authorizes an officer to request identification from such a person. He implies that because § 968.24 permits an officer to ask for identification under these circumstances, an officer may not ask for identification under other circumstances. We reject this interpretation of § 968.24. That statute does not prohibit law enforcement officers from asking individuals for identification. Instead, it authorizes an officer to demand a person's name and address under one particular circumstance—when the person is reasonably suspected of committing a crime. Section 968.24 does not govern the lawfulness of the request for identification in this case.

¶ 36.   Thus, resolution of Griffith's argument is not controlled by *Brown* or by Wis. Stat. § 968.24. Instead, we must make an independent examination of whether the police conduct subsequent to the initially lawful stop transformed the reasonable seizure into an unreasonable one.

¶ 37.   *Brown* sets forth the framework that guides our examination of whether the police conduct in this case constituted an unreasonable seizure:

> The reasonableness of seizures that are less intrusive than a traditional arrest depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

*Id.* at 50 (internal citations omitted).

■

¶ 38. When a person admits that he or she was lawfully seized during a traffic stop but argues that subsequent police conduct violated the Fourth Amendment, the reasonableness inquiry does not focus on the initial stop. Instead, the focus is on "the incremental intrusion" that resulted from the subsequent police conduct. *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). Thus, the issue in Griffith's case is whether the incremental intrusion that resulted from the identification questions was unreasonable. To determine whether the intrusion was unreasonable, we must weigh the public interest served by the questioning against the incremental liberty intrusion that resulted from the questioning. *Wilson*, 519 U.S. at 411–12; *Brown*, 443 U.S. at 50; *Mimms*, 434 U.S. at 109; and *Terry*, 392 U.S. at 20–21.

■

¶ 39. Griffith does not claim that it is always unreasonable for a police officer to ask a passenger his name and date of birth during a traffic stop. He acknowledges that the Fourth Amendment is not implicated whenever "a police officer approaches an individual and asks a few questions. So long as a rea-

sonable person would feel free 'to disregard the police and go about his business,'. . .the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). In the absence of any reasonable, articulable suspicion, police may ask questions, request identification, and ask for consent to search, "as long as the police do not convey a message that compliance with their requests is required." *Id.* at 434–35.

¶ 40.  However, Griffith argues that under the particular circumstances of his case, asking identification questions was unreasonable. Griffith emphasizes two particular aspects of the surrounding circumstances. First, he asserts that the questioning went beyond the scope of the stop because at the time of the questioning, the driver had already admitted that he had no driver's license. Second, he asserts that the questioning was "nonconsensual," in the sense that no reasonable person under the circumstances would have felt free to ignore the questions or decline to answer. The only case Griffith cites that supports his proposition that under these particular circumstances the questioning was an unreasonable seizure is *Holt v. State*, 487 S.E.2d 629 (Ga. Ct. App. 1997).

¶ 41.  We examine the facts that Griffith points to, as well as the rest of the surrounding circumstances, to determine whether the questioning transformed the reasonable seizure into an unreasonable one.

¶ 42.  Warmington initiated the traffic stop of the Bonneville because he personally recognized the car as belonging to Malone, he knew that Malone had no license, and he thought he saw Malone in the driver's seat. Once the car pulled into a parking lot, Warmington and Larrabee blocked it from exiting. The

occupants of the car were directed to stay inside the car as Warmington and Larrabee approached. At some point three additional officers arrived on the scene and stood nearby.

¶ 43. Warmington and Larrabee approached the car and asked the driver and the front seat passenger for routine identification and licensing information. Apparently within moments of speaking to Robinson and Malone, Officer Warmington saw the back seat passenger and thought he looked familiar. Almost immediately, Warmington asked the back seat passenger his name and date of birth.

¶ 44. Although the passenger was already seized incidental to the lawful stop of the Bonneville, the officer's posing of these questions to the passenger did involve some incremental intrusion on the passenger's personal liberty. To determine whether this intrusion was unreasonable, we must weigh the relevant public and private interests.

¶ 45. On the public interest side, we conclude that permitting law enforcement officers to request identifying information from passengers in traffic stops serves the public interest in several ways that are reasonably related to the purpose of a traffic stop.

¶ 46. To begin with, there is a public interest in completing the investigation of the traffic violation that justified the stop in the first place. The record does not support Griffith's assertion that the police had already completed their investigation when they asked the back seat passenger for his name or date of birth. It is true that before Warmington asked the back seat passenger any questions, Robinson had already admitted that he had "lost" his license. However, Robinson's response was ambiguous; it would establish a violation

of either Wis. Stat. § 343.05(3)(a)[11] or Wis. Stat. § 343.18(1).[12] There is no mention in the record that the officers attempted to determine Robinson's exact driving status at that time. Thus, the officers may have wished to obtain information from the rear passenger to complete the investigation that justified the stop in the first place. It is reasonable that they would begin by asking the passenger his name.

¶ 47.  Moreover, even if the officers had already determined that some particular violation had taken place, it seems reasonable under the circumstances that they would seek some additional information, such as whether anyone in the car was licensed to drive. The officers knew that Malone had no license, and Robinson admitted that he did not have a license either. Since neither the driver nor the front passenger could legally drive the car, there was some need to determine how the car would be removed from the apartment parking lot. There is a public interest in determining whether a car must be towed at public expense or may be driven away by a private party. Permitting police officers to talk to passengers during a traffic stop will further this interest.

---

[11] Wisconsin Stat. § 343.05(3)(a) provides:

No person may operate a motor vehicle which is not a commercial vehicle upon a highway in this state unless the person possesses a valid operator's license issued to the person by the department which is not revoked, suspended, canceled or expired.

[12] Wisconsin Stat. § 343.18(1) provides:

Every licensee shall have his or her license document, including any special restrictions cards. . .in his or her immediate possession at all times when operating a motor vehicle and shall display the same upon demand from any judge, justice or traffic officer.

§ 343.18(3) has been amended by 1997 Wis. Act 84, §§ 14 and 15, but those amendments do not affect § 343.18(1).

¶ 48.   We also agree with the State that there is a general public interest in attempting to obtain identifying information from witnesses to police-citizen encounters. If witnesses are willing to identify themselves, they may later be able to assist police in locating the person who violated the law. If questions later arise about police conduct during the stop, passengers may be able to provide information about what occurred during the stop. Passengers are free to refuse to provide identifying information, but if they are willing to provide it, obtaining such information serves the public interest. Permitting officers to request passengers to voluntarily provide identification serves the public interest.

¶ 49.   In sum, on the public side of the balance, we conclude that asking the rear passenger for identification furthered several legitimate public interests and was reasonably related to the purpose of the stop.

¶ 50.   On the private side of the balance, we examine the additional intrusion into the passenger's personal liberty that resulted from the officer's request for identification.

¶ 51.   We are not persuaded by Griffith's assertion that under the circumstances of this case the identification questions were so intrusive that they were "nonconsensual," in the sense that no reasonable person would have felt free to ignore the questions. All of the events in this case took place in public view, in the parking lot of an apartment complex. The record suggests that the entire encounter, from the time that the officers blocked the exit of the parking lot to the time that they asked the back seat passenger for identification, took only a few minutes. The officers spoke with Robinson and Malone, received information suggesting that neither of them was licensed to drive the

car, and then asked the passenger some questions about his identity.

¶ 52.   The passenger had every right to decline to answer, and his refusal to answer could not have resulted in a prosecution for obstructing an officer. *Henes v. Morrissey*, 194 Wis. 2d 338, 353–54, 533 N.W.2d 802 (1995)(explaining that Wis. Stat. § 946.41 does not criminalize refusal to give information). His refusal to answer also would not have given rise to any reasonable suspicion of wrongdoing. *Bostick*, 501 U.S. at 437 (noting that a refusal to cooperate, without more, does not furnish the objective justification needed for a detention or seizure).

¶ 53.   Of course, as the State acknowledges, a reasonable person in the position of the passenger would have felt somewhat less free to ignore the officer's questions than would a person who was not temporarily detained at the time of the questioning. Griffith also emphasizes that this was an unusual traffic stop because it was conducted by plainclothes detectives in an unmarked car and three additional officers arrived at the scene. However, any time that a police officer requests information from an individual, the individual is likely to feel some pressure to respond. Nonetheless, an officer's mere posing of a question does not constitute a "seizure" under the Fourth Amendment. *Bostick*, 501 U.S. at 434. Under the circumstances of this case, we are not persuaded that the simple questions "What is your name?" and "What is your date of birth?" were so intrusive that they transformed the otherwise reasonable seizure into an unreasonable one.

¶ 54.   This does not end our inquiry. Even if the questions themselves are not unreasonably intrusive,

questioning can transform a reasonable seizure into an unreasonable one if it extends the stop beyond the time necessary to fulfill the purpose of the stop. *See United States v. Sharpe*, 470 U.S. 675, 684–85 (1985). "[I]f an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop." *Id.* at 685. To determine whether the stop was unreasonably prolonged, the court must consider the law enforcement purposes to be served by the stop and the time reasonably needed to accomplish those purposes. *Id.*

¶ 55.   We have already noted that the record does not establish that the investigation of the traffic violation was complete when the questions were posed to the back seat passenger. Moreover, even if the officers had already obtained all of the necessary information to establish the traffic violation, it is clear that the time needed to ask the identification questions was very brief.

¶ 56.   The court of appeals has held that the brief period of time it takes to ask a question does not unreasonably prolong a temporary detention. *State v. Gaulrapp*, 207 Wis. 2d 600, 609, 558 N.W.2d 696 (Ct. App. 1996)(holding that a detention was not unreasonably prolonged by the asking of one question). We agree with the court of appeals that this conclusion is implied by the United States Supreme Court's holding in *Ohio v Robinette*, 519 U.S. 33 (1996). *See Gaulrapp*, 207 Wis. 2d at 608.

¶ 57.   *Robinette* considered whether "a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary." *Robinette*, 519 U.S. at 35. After stopping a vehicle for speeding, an officer issued a verbal warning, returned the driver's license, and then asked whether

70

the driver was carrying contraband. *Id.* at 35–36. The driver answered no and then consented to a search of his car. *Id.* at 36. The search turned up illegal drugs. *Id.* The driver was charged and convicted of possessing a controlled substance. *Id.* The Ohio Supreme Court overturned the defendant's conviction on the grounds that under federal and state constitutional guarantees against unreasonable searches and seizures, an officer must always inform a person that he or she is free to go before attempting to obtain consent to a search. *Id.* at 36 (citing *State v. Robinette*, 653 N.E.2d 695, 696 (Ohio 1995), *rev'd, Robinette*, 519 U.S. 33).

¶ 58.  The United States Supreme Court reversed the decision of the Ohio Supreme Court. *Robinette*, 519 U.S. at 40. The Court rejected a *per se* rule requiring officers to inform motorists that they were free to go before asking for consent to search. *Id.* at 39–40. Instead, the Court held that the voluntariness of consent to search is always a fact-specific question to be determined from the totality of the circumstances. *Id.* at 40.

¶ 59.  *Gaulrapp* involved a situation similar to *Robinette*. The driver in *Gaulrapp* was stopped for having a loud muffler. *Gaulrapp*, 207 Wis. 2d at 603. After obtaining identification and discussing the problem with the muffler, the officer asked the motorist whether he had any drugs or weapons inside the vehicle. *Id.* The motorist said that he did not, and the officer asked for permission to search the vehicle. *Id.* The motorist consented, and the search turned up drugs. *Id.* at 603–04.

¶ 60.  The defendant in *Gaulrapp* conceded that the initial stop was lawful but argued that the detention became unlawful when police went beyond the initial purpose of the stop and asked him about drugs

and weapons and for consent to search. *Id.* at 606. The court of appeals noted that the argument that consent is invalid if the request to search is unrelated to the scope of the initial detention is difficult to reconcile with *Robinette's* holding that the defendant's consent to search might have been valid under the circumstances. *Id.* at 608. The court therefore concluded that the questions posed to the defendant in *Gaulrapp* did not unreasonably prolong the seizure. *Id.* at 609.

¶ 61.    Griffith makes an argument that is analogous to the defendant's argument in *Gaulrapp*. Griffith contends that the identification questioning was unreasonable because it occurred after Robinson admitted that he did not have a license. We agree with the court of appeals' conclusion in *Gaulrapp* that the length of time required to ask a question is not sufficiently intrusive to transform a reasonable, lawful stop into an unreasonable, unlawful one.

¶ 62.    In sum, on the private side of the equation, we find that the additional interference with the passenger's personal liberty that resulted from the identification questions was minimal. The passenger was already seized pursuant to a lawful traffic stop. The only change in the passenger's circumstances that resulted from the questioning is that rather than sitting silently while being temporarily detained, he had to decide whether to answer the officer's questions. The passenger probably felt some obligation to respond to the officer's questions, but he was under no legal obligation to do so and could not have been prosecuted for refusing to respond.

¶ 63.    Weighing the public interest served by permitting police to request identifying information from passengers against the incremental intrusion upon

individual privacy interests, we conclude that the public interests are substantial and the interference with private liberty interests is *de minimis*. We therefore hold that the identification questions did not transform the reasonable search into an unreasonable one under the circumstances of this case.[13]

¶ 64.   Griffith points to a decision of the Georgia Court of Appeals that contradicts this holding. *See Holt*, 487 S.E.2d at 632–33 (holding that an officer lacked authority to request identification from a passenger in the absence of a reasonable basis for believing that the passenger was engaged in criminal activity). *Holt* is distinguishable factually from Griffith's case because the driver in *Holt* had a valid driver's license and the officers had already issued a citation before they began asking questions of the passengers. *See id.* at 630. In addition, *Holt's* holding is based on the reasoning that a request for identification is an "interrogation" that is unreasonable in the absence of some justification beyond the reasonable suspicion that justifies the initial stop. *See id.* at 632. For the reasons already stated, we are not persuaded by this reasoning.

---

[13] In reaching this holding, we do not claim that "Griffith was not seized upon the questioning as to his identity," dissent at ¶ 85, and we do not "lower[ ] the [constitutional] standard to meet the facts in this case." Dissent at ¶ 101. Griffith was seized at the time of the questioning. This fact is what requires us to focus on the "incremental intrusion" that resulted from the questioning, rather than on the circumstances of the initial stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977). In adherence to the law, we conclude that the incremental intrusion that resulted from the questioning did not transform the lawful, reasonable seizure into an unlawful, unreasonable one.

¶ 65.   We hold instead that when a passenger has been seized pursuant to a lawful traffic stop, the seizure does not become unreasonable under the Fourth Amendment or art. I, § 11 simply because an officer asks the passenger for identification during the stop. Passengers are free to decline to answer such questions, and refusal to answer will not justify prosecution nor give rise to any reasonable suspicion of wrongdoing. However, if a passenger chooses to answer but gives the officer false information, the passenger can be charged with obstructing an officer in violation of Wis. Stat. § 946.41(1).

## IV

¶ 66.   Griffith claims that our holding is inconsistent with the legitimate expectations of privacy of a free citizenry. He argues that our holding will subject individuals in automobiles to the unfettered discretionary decisions of individual police officers. He cites *Delaware v. Prouse*, 440 U.S. 648, 661–63 (1979), in which the Supreme Court held that in the absence of reasonable suspicion, discretionary spot checks of driver's licenses and vehicle registration cannot be justified by the marginal public interest in roadway safety. He contends that an unreasonable seizure occurs when a police officer poses the question "What is your name?" to a passenger during a traffic stop, if the officer lacks any reasonable suspicion that the passenger is or has been involved in wrongdoing.

¶ 67.   Griffith is certainly correct that an individual traveling in an automobile does not lose all legitimate expectations of privacy. He is also correct that individuals may not be subjected to selective, dis-

cretionary intrusions upon their legitimate expectations of privacy.

¶ 68. However, we do not hold that officers may conduct discretionary investigative stops of vehicles in the absence of reasonable suspicion. We also do not hold that officers may make selective, discretionary decisions to request identification based on unconstitutional considerations. We only hold that neither the Fourth Amendment nor art. I, § 11 prohibits a law enforcement officer from asking for identification from a passenger who has been incidentally and lawfully seized in a traffic stop, when, as in this case, the passenger is free to refuse the request.

¶ 69. Any other rule would be unreasonable. Griffith acknowledges that a law enforcement officer who is walking down the street is free to pose the question, "What is your name?" to any passerby, so long as the officer does not send the message that the passerby must answer. Yet he seeks a rule that the same officer may not pose that question to a passenger during a lawful traffic stop, even if the officer does not require the passenger to answer the question. We reject Griffith's contention that the mere question "What is your name?" transforms a reasonable, lawful seizure into an unreasonable, unlawful one.[14]

[14] Of course, no individual may be compelled to incriminate himself or herself. U.S. Const. amend. V; Wis. Const. art. I, § 8(1). Our holding does not impair this right to avoid self-incrimination. The United States Supreme Court has held that persons temporarily detained in ordinary traffic stops are not "in custody" and therefore not subject to the rule in *Miranda v. Arizona*, 384 U.S. 436 (1966). *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *see also State v. Swanson*, 164 Wis. 2d 437, 449, 475 N.W.2d 148 (1991). However, the Court made clear that if a detained motorist is treated in such a manner that he or she is

¶ 70. For the foregoing reasons, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 71. ANN WALSH BRADLEY, J. *(dissenting).* The crux of this case is whether a reasonable person in Terry Griffith's position would have felt free to disregard the officer's questions and to go about his business. The majority answers this question in the affirmative. I disagree.

¶ 72. The facts reveal that the Bonneville, in which Griffith was a rear passenger, entered a residential driveway and stopped. Detectives Larrabee and Warmington pulled into the driveway behind the vehicle to block any attempted exit. As Tyrone Malone began to exit the Bonneville with the intent to enter the residence, the officers approached the vehicle while displaying their badges and ordered Malone and all other occupants to remain inside the vehicle.

¶ 73. Investigator Geller, responding to a call for assistance, arrived next on the scene in an unmarked squad car. On his heels followed the arrival of Patrol Officer Jackson in a marked squad car and Patrol Officer Waystedt in a separate marked squad car.

¶ 74. It is against this backdrop of a blocked exit and an order to remain inside the car, surrounded by five police officers and four police vehicles, that the majority concludes a reasonable person in Griffith's position would have enjoyed the freedom to disregard

---

rendered "in custody" for practical purposes, *Miranda* protections are triggered. *Berkemer*, 468 U.S. at 440. Griffith does not claim that the questioning in this case violated his right to avoid incriminating himself.

Officer Warmington's questions and go about his business. The test set forth in *Florida v. Bostick*, 501 U.S. 429, 437 (1991), establishes that in the absence of reasonable suspicion, police may ask questions of an individual "so long as the officers do not convey a message that compliance with their requests is required." The facts in this case fail to meet that test.

¶ 75. I agree with the majority that the initial traffic stop in this case, supported by reasonable and articulable suspicion, constituted a lawful seizure of Griffith. A reasonable seizure as to the driver of a detained car is necessarily reasonable as to all other occupants of the car. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *State v. Harris*, 206 Wis. 2d 243, 254–57, 557 N.W.2d 245 (1996).

¶ 76. The request for Griffith's identification, however, severed the constitutional chain stemming from the initial vehicle stop and was not part and parcel of one lawful detention. *See Harris*, 206 Wis. 2d at 260 n.14.[1] Griffith was seized apart from the traffic stop when he was questioned while not enjoying the freedom to terminate the interrogation. This seizure was unreasonable because it was not supported by either individualized suspicion or a legitimate law enforcement purpose. Griffith's interrogation therefore violated his Fourth Amendment rights.

¶ 77. Fourth Amendment jurisprudence centers on the preservation of an "inestimable right of personal security." *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968). Not all interrogations relating to one's identity infringe upon this right or constitute seizures implicating concerns of

---

[1] In *State v. Harris*, 206 Wis. 2d 243, 260 n.14, 557 N.W.2d 245 (1996), this court recognized that a reasonable traffic stop does not foreclose the assessment of a subsequent detention that is subject to Fourth Amendment constraints.

an unconstitutional magnitude. *I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984). Effective police practice may indeed warrant identity questioning under other facts.

¶ 78.  Such questioning assumes the status of a seizure only when the facts taken in the aggregate demonstrate a show of official authority such that a reasonable person would not feel free to walk away from the questions posed. *Florida v. Royer*, 460 U.S. 491, 502 (1983) (plurality opinion). Essentially, one is seized in the absence of freedom to terminate the encounter and to disregard the interrogation. *Bostick*, 501 U.S. at 436–37.

¶ 79.  The majority concedes that the questions posed to Griffith intruded upon his personal liberty. Majority op. at ¶ 44. The majority further concedes that a person in Griffith's position would feel "less free to ignore the officer's questions." Majority op. at ¶ 53. Yet, the majority perpetuates a legal fiction by reasoning that Griffith could have chosen not to respond under the facts presented.

¶ 80.  After following the Bonneville as it entered a residential driveway, Detectives Larrabee and Warmington pulled in behind the car and blocked the driveway to prevent the car's exit. Blocking a person's path or exit constitutes conduct that a reasonable person would deem threatening and suggests that a seizure has occurred. 4 Wayne R. LaFave, *Search and Seizure* § 9.3(a), at 103–04 (3d ed. 1996).

¶ 81.  Emerging from his car and displaying a police badge as he approached the Bonneville, Officer Warmington then ordered the occupants of the Bonneville to remain inside the car. This command to stay in the car represented an obvious show of force that precluded Griffith from walking away from the situation. *See State v. Mendez*, 970 P.2d 722, 729 (Wash. 1999)

(noting that police officer's order for passenger to get back into the car constituted a seizure of passenger).

¶ 82. Although the restriction of mobility does not necessarily lead to a determination that Griffith was unable to disregard the officer's questions, it nevertheless represents a critical factor indicating that Griffith was seized. "An unequivocal verbal command is far more likely to produce the perception of restricted liberty than a mere approach." *People v. Spicer*, 203 Cal. Rptr. 599, 603 (Cal. Ct. App. 1984).

¶ 83. Three additional law enforcement officers arrived in three separate squad cars and stood next to the Bonneville as Griffith was questioned. Thus, a total of five police officers and four police vehicles were present at the scene of the interrogation. The presence of numerous law enforcement officers surrounding a person represents yet another factor indicating a seizure. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); LaFave, *Search and Seizure*, § 9.3(a) at 104.

¶ 84. The majority seeks shelter from the length of the detention and presumes that Griffith's questioning followed shortly after the stop of the vehicle. Majority op. at ¶¶ 54–56, 61. This emphasis on the duration of the stop ignores the intimidating nature of the circumstances involved. Interrogation that lasts one minute under a coercive atmosphere lasts one minute too long.

¶ 85. Taken together, the facts surrounding Griffith's interrogation compel the conclusion that a reasonable person in his position would not have enjoyed the freedom to terminate the encounter with Officer Warmington or to disregard the questions posed and to go about his business.[2] Indeed, it is fanci-

___

[2] In *Florida v. Bostick*, 501 U.S. 429, 437 (1991), the United States Supreme Court suggested that the bus passenger who

ful to claim that Griffith was not seized upon the questioning as to his identity.

¶ 86.   Once a seizure had been established, the subsequent inquiry centers on the reasonableness of that seizure. The seizure in this case may have survived constitutional scrutiny if it were nevertheless reasonable. It was not. The touchstone of analysis under the Fourth Amendment is reasonableness in view of the totality of the circumstances. *Terry*, 392 U.S. at 19. To be reasonable under the Fourth Amendment, a seizure ordinarily must be predicated on individualized suspicion of misconduct. *Chandler v. Miller*, 520 U.S. 305, 308 (1997); *Terry*, 392 U.S. at 21.

¶ 87.   To that end, *Brown v. Texas*, 443 U.S. 47 (1979), is instructive. Although the majority attempts to distinguish the relevance of *Brown*, it acknowledges the general proposition for which the case stands. Majority op. at ¶¶ 29–34. *Brown* cautions that absent reasonable suspicion of individual misconduct, officers may not seize a person for the purposes of requiring identification or questioning related to that person's

---

had been asked for consent to a search of his bags was not seized because a reasonable person in his position would have felt free to terminate the encounter with the law enforcement officers. One of the factors upon which the Court hinged its determination was that the officers had conveyed to the passenger his right to refuse consent. *Id.* The Court mentioned that the passenger's knowledge of his right to refuse consent was a fact "particularly worth noting." *Id.* at 432.

No steadfast and blanket requirement exists mandating that officers advise a detained passenger of the right to refrain from answering questions. However, in the circumstances of this case, the absence of such advisement is another factor that reveals the intimidating nature of Griffith's interrogation.

identity. 443 U.S. at 51–52. *See also Delgado*, 466 U.S. at 216 (discussing *Brown*).

¶ 88. As mentioned, Griffith was seized subsequent to the initial traffic stop when he was questioned in circumstances evincing the inability to disregard the questioning. Rather than reflecting any reasonable suspicion of misconduct, Officer Warmington's trial testimony indicates that he acted on the proverbial "hunch[ ]" that *Terry*, 392 U.S. at 22, explicitly refused to sanction:

Q: Was there a third person inside that vehicle?

A: Yes, there was.

Q: And where was that person seated?

A: To the left rear behind the driver.

Q: What were your initial observations when you first saw him?

A: Light skinned black male, square jaw, blemishes on his face, appeared to be somebody that to me I knew I had contact with. I couldn't recall the party's name.

Q: Did you ask the rear passenger for any identification?

A: Yes, I did.

¶ 89. No specific and articulable facts constituting reasonable suspicion can be gleaned from the record to support the intrusion posed by Griffith's interrogation. A hint of recognition is an inadequate justification, absent individualized suspicion, for subjecting the passenger to questioning that infringes upon the passenger's protected right of privacy and that occurs in an atmosphere of intimidation.

¶ 90.    Absent individualized suspicion, a determination of reasonableness hinges on whether important governmental objectives are to be advanced by the seizure. Limited circumstances may render a seizure reasonable despite the absence of such suspicion if the privacy interests implicated by the seizure are minimal, and an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion. *Chandler*, 520 U.S. at 314 (quoting *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 624 (1989)). Here, the actual record is devoid of any reference to legitimate law enforcement objectives or public interest concerns to justify the intrusion upon Griffith's right to privacy.

¶ 91.    There is no testimony whatsoever in the record supporting the majority's theory that the questions directed at Griffith were asked to further the investigation. In the absence of testimony to support its theory, the majority nevertheless imputes such motivation to the officers. What the record reveals instead is that the officers confirmed the basis of their traffic stop when they discovered that the driver of the Bonneville indeed had been driving without a license.

¶ 92.    If, as the majority claims, any ambiguity existed concerning Damien Robinson's particular driving status, neither the majority nor the officers have adequately explained how requesting Griffith's name, age, and apparently his home address would illuminate the officers as to Robinson's driving status. Rather, a check with the Department of Motor Vehicles would have remedied any ambiguity.

¶ 93.    Furthermore, the officers never expressed the intent to inquire whether Griffith himself had a valid license so that he could drive the Bonneville out of the driveway. The fact that the Bonneville had entered

a residential driveway and that Malone intended to enter the residence suggests that the occupants had reached their destination. Unlike a traffic stop on a highway, here there is nothing to suggest that the car needed to be removed from its location.

¶ 94.   *People v. Spicer*, 203 Cal. Rptr. 599 (Cal. Ct. App. 1984), presents similar facts to this case. The passenger in *Spicer* had been lawfully stopped based on a suspected traffic violation. Upon discovering that the driver of the car was intoxicated and unable to drive, one officer requested a driver's license from the passenger. As she searched for the license, the officer discovered a gun in her purse.

¶ 95.   The passenger's motion to suppress the weapon was granted and eventually upheld. The court concluded that she had been seized when asked for her license because the encounter was sufficiently intimidating to preclude her refusal of the officer's request. *Id.* at 602–03. In the absence of individualized suspicion as to the passenger, the request for identification constituted an unlawful seizure. *Id.* at 604–05.

¶ 96.   The *Spicer* court acknowledged that the officer had presented a legitimate basis for his request: in the event that the driver was arrested for drunk driving and the vehicle was charged to the care of the passenger, the officer wished to verify that the passenger possessed a valid California driver's license. *Id.* at 601. Nevertheless, the court determined that the officer's failure to convey this justification to the passenger contributed to the coercive nature of the request. *Id.* at 603.

¶ 97.   Unlike the officer's testimony in *Spicer*, in the present case there is no testimony whatsoever suggesting that Officer Warmington predicated his request for Griffth's name and age on furthering a

legitimate governmental objective. Although the majority imputes to the officer motives of promoting the public interest, the record provides no intimation of these laudable motives.

¶ 98. What the record reveals instead is an officer acting on an "inarticulate hunch[ ]." *Terry*, 392 U.S. at 22. Weighing the unexpressed public interest against Griffith's interest in personal security tips the scale in favor of Griffith's right to be free from arbitrary interference by law enforcement under these particular facts. *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).[3]

¶ 99. It is of course a proper police procedure to request identification in a myriad of situations, but not here. Griffith was questioned under circumstances in which he was not free to disregard the police questions and to go about his business. This seizure was unreasonable because based on the record it was not supported by either individualized suspicion or a desire to further a legitimate law enforcement objective.

¶ 100. By dismissing the significant degree of intimidation in this case, as well as the absence of both

---

[3] The majority attempts to distinguish *Holt v. State*, 487 S.E.2d 629 (Ga. Ct. App. 1997), but does so without success. In both *Holt* and the present case, the basis for the initial stop had been confirmed prior to the interference with the passenger's privacy interests in the form of a request for identification.

The fact that the driver in *Holt* had a valid driver's license, as well as the fact that the officer had issued citations prior to the unlawful questioning, represent factual distinctions without a difference for the purposes of the present analysis. *Holt* stands for the proposition that an officer lacking reasonable and individualized suspicion of criminal activity is not engaged in the lawful discharge of official duties when inquiring about a person's identity and age. 487 S.E.2d at 632–33.

individualized suspicion and legitimate law enforcement objectives, the majority sanctions the indiscriminate interrogation of a countless number of passengers whose only transgression is their presence in vehicles stopped for traffic violations. It is the concern of sanctioning such indiscriminate interrogation that spurs a dissent in this fact-specific case.

¶ 101.  Facts shape the contours of our constitutional guarantees. When the majority lowers the standard to meet the facts in this case, it dilutes the constitutional rights of us all. Bit by bit, almost unnoticed, our constitutional freedoms may be eroded until one day we awaken to discover that those freedoms for which so many have fought and sacrificed have been diminished. Accordingly, I dissent.

¶ 102.  I am authorized to state that SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE, joins this dissenting opinion.