COURT OF APPEALS
DECISION
DATED AND FILED

March 16, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP2177-CR**

Cir. Ct. No.  **2016CF225**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

V.

RANDY LEE ROSS,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Sawyer County:  JOHN M. YACKEL, Judge.  *Affirmed.*

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Randy Ross appeals from a judgment convicting him of two drug offenses and an order denying his postconviction motion.  The

sole issue on appeal is whether Ross's trial counsel provided ineffective assistance by failing to investigate and call a potential witness to testify at Ross's suppression hearing. We conclude Ross has failed to demonstrate prejudice from the alleged error by his counsel. We therefore affirm.

## BACKGROUND

¶2 The State charged Ross with possession of methamphetamine, possession of THC as a second or subsequent offense, and possession of drug paraphernalia, based on evidence seized following an investigatory stop. Ross filed a suppression motion alleging that law enforcement officers impermissibly extended the investigatory stop.

¶3 The circuit court made the following findings of fact after holding a suppression hearing at which Ross and two law enforcement officers testified. Deputy Nate Frey was dispatched to investigate a possible residential burglary in progress. Upon arriving at the location, Frey observed a vehicle exiting the driveway of the residence. Frey stopped the vehicle, pulled out his gun, and ordered the driver to get out.

¶4 Frey recognized the driver as Ross. Frey handcuffed Ross and conducted a pat-down search. Ross responded to the pat-down in a manner that Frey thought was "somewhat odd," but Frey allowed Ross to sit on the ground next to his vehicle while the investigation continued. Ross told Frey that he had his mother's permission to be on the property, and he provided her telephone number. Frey relayed the number to dispatch, who contacted Ross's mother and confirmed that Ross had permission to be on the property. Frey then uncuffed Ross and apologized to him for the inconvenience of detaining him while determining what was happening.

2

¶5      Before leaving, and with two law enforcement vehicles still blocking the driveway, Frey asked Ross why he had reacted the way he did when Frey patted him down.  Ross responded that he had some marijuana on him, took a small amount of marijuana from his pocket, and placed it on the hood of his vehicle.  During the ensuing conversation, Ross also admitted that he had some "dope" on him, removed some methamphetamine from his pocket, and placed it on the hood of his vehicle as well.  Frey then took Ross into custody.

¶6      Ross testified that after Frey had verified Ross's right to be on the property and uncuffed him, Ross asked Frey to leave.  According to Ross, Frey stated that he was not going to leave until Ross emptied out his pockets, and that if Ross tried to run, Frey would "light [him] up."  However, the circuit court observed that Frey and another law enforcement officer who arrived just as Frey was removing the handcuffs from Ross both denied that Ross had asked them to leave.  The court found the law enforcement officers' testimony to be more credible than Ross's testimony.

¶7      The circuit court determined Ross was free to leave after he had been uncuffed and chose to voluntarily engage in further conversation with Frey, during which time he admitted to possessing drugs.  The court concluded that Frey had not impermissibly extended the investigatory stop, and it denied the suppression motion.  Ross then pleaded guilty to the three charges, and he was sentenced at a later proceeding.

¶8      Ross subsequently filed a postconviction motion seeking to withdraw his pleas on the grounds of ineffective assistance of counsel.  Ross alleged that his trial counsel should have investigated and called Amy Jennings at

the suppression hearing to support Ross's assertion that he had told the law enforcement officers to leave his property.

¶9     At the postconviction hearing, Jennings testified that she had accompanied Ross to his family's cabin, and she had witnessed his encounter with police from about twenty to twenty-five feet away. Jennings said Ross yelled at the first law enforcement officer to "get the F off my property" at the very beginning of the encounter. Ross repeated similar statements throughout the encounter, as he tried to explain that he had a right to be on the property. When asked if Ross had told the officers to leave or get off his property after the second law enforcement officer arrived, Jennings stated that she was not sure of the sequence of events.

¶10     On cross-examination, Jennings acknowledged that she was a former girlfriend of Ross. She stayed back in a wooded area behind some trees and did not make herself known to the law enforcement officers. It was dark outside, and Jennings could not hear what the officers were saying, only what Ross was yelling. She saw Ross being placed in handcuffs, but she did not remember the handcuffs being removed. Her testimony was that Ross was yelling for the police to "get the F off his property" the entire time he was in handcuffs. At the time of the suppression hearing, Jennings was in custody in Massachusetts.

¶11     Ross's trial counsel, Joel Larimore, testified that Ross first told him about Jennings either the week before or the week of the suppression hearing. Larimore discussed with Ross the logistical difficulty of getting Jennings to appear at the hearing, as well as the probability that the judge would not believe her testimony over that of the law enforcement officers. Larimore thought the best chance to win the suppression motion would be if the law enforcement officers

conceded Ross had told them to get off the property. He thought putting Jennings on the witness list might tip off the State and give the prosecutor an opportunity to prepare the law enforcement officers' testimony.

¶12 The circuit court determined that Jennings' testimony would not have changed the court's decision on the suppression motion. The court therefore denied the postconviction motion. Ross now appeals.

## DISCUSSION

¶13 A defendant seeking to withdraw a plea after sentencing on grounds other than a defective plea colloquy must demonstrate by clear and convincing evidence that refusal to allow plea withdrawal would result in a "manifest injustice," raising "serious questions affecting the fundamental integrity of the plea." *State v. Dillard*, 2014 WI 123, ¶83, 358 Wis. 2d 543, 859 N.W.2d 44. One way to demonstrate manifest injustice is to show that the defendant received ineffective assistance of counsel. *Id.*, ¶84.

¶14 To establish a claim of ineffective assistance, a defendant must prove two elements: (1) deficient performance by counsel; and (2) prejudice resulting from that deficient performance. *State v. Sholar*, 2018 WI 53, ¶32, 381 Wis. 2d 560, 912 N.W.2d 89. We will not set aside the circuit court's factual findings about what actions counsel took or the reasons for them unless they are clearly erroneous. *State v. Balliette*, 2011 WI 79, ¶19, 336 Wis. 2d 358, 805 N.W.2d 334. Whether counsel's conduct violated the constitutional standard for effective assistance is, however, ultimately a legal determination that this court decides independently. *State v. Swinson*, 2003 WI App 45, ¶57, 261 Wis. 2d 633, 660 N.W.2d 12.

¶15 We need not address both elements of the ineffective assistance test if the defendant fails to make a sufficient showing on one of them. *Id.*, ¶58. In this case, we conclude that Ross has failed to demonstrate prejudice.

¶16 A defendant proves prejudice by demonstrating there is a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). The "reasonable probability" standard does not require a showing that a different result is "more likely than not." *Sholar*, 381 Wis. 2d 560, ¶44. Still, the "reasonable probability" standard is tied to the reviewing court's confidence in the outcome, and the "likelihood of a different result must be substantial, not just conceivable." *Id.*, ¶45; *see also Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

¶17 The proceeding at issue here was a suppression hearing. To prevail on his motion, Ross needed to establish that his initially justified detention had been extended beyond the purpose of the stop. *See State v. Griffith*, 2000 WI 72, ¶54, 236 Wis. 2d 48, 613 N.W.2d 72. The State proffered alternate theories that either Ross's unusual reaction to the pat-down search provided new grounds for further detention and additional investigation, or that Frey engaged Ross in a voluntary conversation after the initial detention had ended and at a time when Ross was free to leave. Whether Ross had told the police to leave his property after he was uncuffed was relevant to the circuit court's ultimate determination that Ross had voluntarily engaged in a postdetention conversation with Frey.

¶18 Like the circuit court, we see no substantial likelihood of a different result at the suppression hearing if Jennings had testified. First, Jennings' credibility was undermined, to some degree, not only by her prior romantic

6

relationship with Ross, but by her unwillingness to reveal herself to law enforcement officers at the time of the incident. Because only Ross could corroborate Jennings' presence at the scene, her testimony about what occurred was less persuasive. Second, Jennings' ability to accurately observe the encounter was also questionable, given her distance from where Ross was detained and the fact that she did not observe Ross being uncuffed in the midst of the encounter. Both of these limitations made it unlikely that the court would give more weight to Jennings' testimony than to that of the law enforcement officers who testified that Ross never told them to leave the property.

¶19 Third, and most significantly, even if the circuit court credited Jennings' assertion that she heard Ross say "get the F off my property" multiple times, Jennings could not tie those statements to the relevant time period that occurred—i.e., after the initial investigatory stop had been resolved. To the contrary, Jennings indicated that the statements were made at the "initial encounter" and while Ross was in handcuffs and attempting to explain that it was his family's property. Simply put, law enforcement had no obligation to honor a request or directive to leave the property while they were still investigating the burglary call and verifying that Ross was present at the property with permission. Any such directive to Frey prior to when Frey uncuffed Ross would not be dispositive of the ultimate question at the suppression hearing—i.e., whether Ross voluntarily engaged in further conversation with Frey after the investigation into the potential burglary had concluded.

¶20 We conclude the circuit court properly denied the postconviction motion on the grounds that Ross could not demonstrate prejudice from his trial counsel's failure to call Jennings at the suppression hearing. Accordingly, we affirm the judgment of conviction and postconviction order.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).