STATE of Wisconsin, Plaintiff-Respondent,

v.

Christopher GAMMONS, Defendant-Appellant.

Court of Appeals

*No. 00–0377–CR. Submitted on briefs December 7, 2000.—Decided January 11, 2001.*

2001 WI App 36

(Also reported in 625 N.W.2d 623.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Keith A. Findley* of the *Criminal Appeals Project, Frank J. Remington Center, University of Wisconsin Law School*, Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Jennifer E. Nashold*, assistant attorney general.

Before Dykman, P.J., Roggensack and Johnston, JJ.[1]

¶ 1. DYKMAN, P.J. Christopher Gammons appeals from a judgment convicting him of possession of cocaine with intent to deliver. After a police officer stopped the vehicle in which he was a passenger, police eventually found drug evidence that led to his conviction. Gammons argues that the officer lacked a reasonable suspicion to stop the vehicle. He also argues that, even if the officer had a reasonable suspicion to stop the vehicle, the officer exceeded the permissible scope of the stop by continuing to detain the vehicle, asking questions about identification and drugs, and asking to search the vehicle. The State contends that the officer's continued detention of the vehicle and his questions were permissible because he reasonably sus-

---

[1] Circuit Judge William D. Johnston is sitting by special assignment pursuant to the Judicial Exchange Program.

pected drug activity at the time of the detention and questioning. We conclude that the officer exceeded the permissible scope of the investigation when he continued to detain the vehicle after the driver told him there were no drugs in the vehicle and that he could not search it. We therefore reverse.

## I. Background

¶ 2.    On July 17, 1998, Officer John Fahrney stopped a vehicle driven by Tommy Farr because it did not have a rear license plate. Gammons and a third man, Stephen Baskin, were passengers. After Fahrney stopped the vehicle and approached it, he noticed that it had a temporary registration sticker. Fahrney asked all three men for identification. He then ran a driver's license check on Farr and warrant checks on Gammons and Baskin.

¶ 3.    Fahrney also asked Farr if there were any drugs in the vehicle, and Farr responded that there were not. Fahrney asked permission to search the vehicle, and Farr refused. Fahrney then told Farr that he would get a police dog to sniff around the vehicle and detect any drugs that were present, after which Farr told Fahrney that he could search the vehicle. At the suppression hearing, Fahrney testified as follows:

A.    I obtained Mr. Farr's driver's license information and ran a driver's license check on him. And asked him if there were any drugs in the vehicle.

Q.    And what was his response?

A.    He said no.

Q.    And then what occurred?

A. I asked him if he would allow me to search the inside of the vehicle for drugs.

Q. And what was his response?

A. He said no.

Q. And then what did you do at that point?

A. I advised him I would be getting my police dog out of the car to walk around his vehicle and explained to him if the dog detected any narcotics inside the vehicle he would indicate as such, and if that happened, then I would search his vehicle.

Q. And what happened after that?

A. He then told me to go ahead and search his vehicle.

Farr also testified that he and Fahrney had this conversation.

¶ 4. Additional officers arrived on the scene, and the police ordered Gammons out of the vehicle. Officer John McMahon patted down Gammons and found marijuana on Gammons' person. Gammons struggled with McMahon or other officers before or during the pat down, and the police also found cocaine in the area outside the vehicle where Gammons had been positioned.

¶ 5. Gammons was charged with possession of cocaine with intent to deliver within one thousand feet of a school in violation of WIS. STAT. §§ 961.41(1m)(cm)1 and 961.49(1)(b)6 (1997–98),[2] obstruction of an officer in violation of WIS. STAT. § 946.41(1), and possession of THC in violation of § 961.41(3g)(e), all as a habitual offender under WIS. STAT. § 939.62(1)(a) and (b). Gam-

[2] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

mons moved to suppress all evidence seized by the police on the night of the stop. The trial court denied the motion, and Gammons pleaded guilty to the possession with intent to deliver charge. The trial court entered a judgment of conviction, and Gammons appeals.

## II. Analysis

¶ 6. A traffic stop is a form of seizure triggering Fourth Amendment protections from unreasonable searches and seizures. *State v. Guzy*, 139 Wis. 2d 663, 675, 407 N.W.2d 548 (1987). The police must have a reasonable suspicion, grounded in specific articulable facts and reasonable inferences from those facts, that an individual is violating the law. *Id.* We first determine whether the initial interference with an individual's liberty was justified, and then consider whether subsequent police conduct was reasonably related in scope to the circumstances that justified the initial interference. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968); *State v. Griffith*, 2000 WI 72, ¶ 26, 236 Wis. 2d 48, 613 N.W.2d 72. We uphold the trial court's findings of fact unless they are clearly erroneous. *State v. Young*, 212 Wis. 2d 417, 424, 569 N.W.2d 84 (Ct. App. 1997). Whether the circumstances of a stop or detention meet constitutional standards, however, is a question of law that we review de novo. *Id.*

¶ 7. Gammons first argues that, because the vehicle bore a temporary license sticker, Fahrney lacked a reasonable suspicion to stop it.[3] We disagree.

---

[3] As a preliminary matter we note that, as a passenger in a stopped vehicle, Gammons has standing to challenge police conduct during a stop that violated his Fourth Amendment rights.

In *State v. Griffin*, 183 Wis. 2d 327, 329, 515 N.W.2d 535 (Ct. App. 1994), we held that "the absence of a registration plate, and reasonable inferences that can be drawn from that fact, constitute[ ] reasonable suspicion sufficient to justify an investigatory stop of a motor vehicle." In *Griffin*, the defendant's vehicle bore a "license applied for" sign. *Id.* at 329–30. We reasoned that, without stopping the vehicle, the officers in *Griffin* had no way of knowing whether the defendant was in violation of vehicle registration laws. *Id.* at 333–34.

¶ 8.  While the temporary license sticker in this case may be a better indicator of registration than the "license applied for" sign in *Griffin*, the trial court found that at the time of the stop, Fahrney did not see the temporary sticker. Therefore, like the officers in *Griffin*, Fahrney had no way of knowing whether Farr was in compliance with vehicle registration laws without stopping the vehicle.

¶ 9.  Gammons seems to suggest in his brief that Fahrney could not have had a reasonable suspicion to stop the vehicle because he "could have" seen the temporary sticker if he had looked more closely. But what Fahrney could have seen is not the test. The trial court found that Fahrney did not initially see the sticker. This finding was not clearly erroneous because it is supported by evidence in the record. *See State v. Hampton*, 217 Wis. 2d 614, 622, 579 N.W.2d 260 (Ct. App. 1998). At the time that Fahrney stopped the vehicle, it was dark, and Fahrney testified that he did not see the sticker until after he stopped the vehicle. Baskin testified that the sticker, though orange with dark lettering, was only about eight to ten inches long by three to four inches high.

*State v. Harris*, 206 Wis. 2d 243, 255–56, 557 N.W.2d 245 (1996).

¶ 10.  Gammons next argues that when Fahrney approached the vehicle and saw the temporary sticker, any suspicions of illegal activity were dispelled, and he no longer had a basis to detain Gammons and the other men. Therefore, Gammons argues, all of the subsequent police questioning and conduct, including Fahrney's extraction of Farr's consent to search the vehicle, exceeded the permissible scope of the stop.

¶ 11.  During an investigative detention, whether the intrusion is reasonable depends on whether the police conduct is reasonably related to the circumstances justifying the initial police interference. *Terry*, 392 U.S. at 19–20; *Griffith*, 2000 WI 72 at ¶ 26. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "The scope of the detention must be carefully tailored to its underlying justification." *Id.* The State has the burden to show that any seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope. *Id.*

¶ 12.  The supreme court has concluded that "when a passenger has been seized pursuant to a lawful traffic stop, the seizure does not become unreasonable . . . simply because an officer asks the passenger for identification during the stop." *Griffith*, 2000 WI 72 at ¶ 65. In *Griffith*, the court identified several reasons why a police officer may need to investigate the identity of passengers during the course of a traffic stop. *Id.* at ¶¶ 45–48. For example, police may need to determine whether anyone other than the driver in the vehicle is licensed to drive, or they may

need to identify potential witnesses to unlawful conduct. *Id.* at ¶¶ 47–48.

¶ 13.    Fahrney did not violate Gammons' Fourth Amendment rights by requesting his driver's license and running a check on him. As the *Griffith* court explained, such questions and actions are reasonably related in scope to the purpose of a traffic stop, and no further justification is required. *Griffith*, 2000 WI 72 at ¶ 45.

¶ 14.    The question of whether Fahrney could permissibly ask Farr and the others about drugs and to search the vehicle is a closer one, and so we next examine in some detail the principal cases on which Gammons and the State rely. The State relies primarily on *State v. Gaulrapp*, 207 Wis. 2d 600, 558 N.W.2d 696 (Ct. App. 1996), arguing that police may extend a stop and ask questions unrelated to the justification for the stop.

¶ 15.    In *Gaulrapp*, two police officers stopped the defendant for a defective muffler. *Gaulrapp*, 207 Wis. 2d at 603. One of the officers asked the defendant if he had any drugs or weapons in the vehicle, and he replied that he did not. *Id.* at 603. The police then asked if they could search the vehicle and his person, and the defendant replied that they could. *Id.* The police found cocaine on the defendant and marijuana in his truck. *Id.* at 603–04. The defendant moved to suppress the evidence on the ground that the police had illegally expanded the scope of a traffic stop when they asked him about drugs and weapons. *Id.* at 604. The trial court denied the motion. *Id.*

¶ 16.    On appeal, the defendant in *Gaulrapp* argued that "the very asking of the first question about drugs and firearms, without a reasonable suspicion

that he possessed either, transformed the legal stop into an illegal stop, making his consent automatically invalid." *Gaulrapp*, 207 Wis. 2d at 608. We disagreed, explaining that Fourth Amendment jurisprudence does not focus only on the subject matter of the questions. *Id.* at 609. We reasoned that "[the defendant]'s detention was not unreasonably prolonged by the asking of one question." *Id.*

¶ 17. Gammons relies primarily on a different case, *State v. Betow*, 226 Wis. 2d 90, 593 N.W.2d 499 ( Ct. App. 1999). In *Betow*, the defendant was stopped for speeding. *Betow*, 226 Wis. 2d at 92. After a computer check on the vehicle and the defendant's license revealed no further law violations, the police officer began questioning the defendant. *Id.* The officer asked the defendant if he could search the vehicle with the aid of a police dog. *Id.* The defendant refused the vehicle search, although he consented to a pat down of his person. *Id.* at 92. After finding nothing on the pat down, the officer decided to continue to detain the defendant and conduct a dog-assisted search of the vehicle anyway. *Id.* at 92–93. With the dog's assistance, the officer located marijuana in the defendant's vehicle. *Id.* at 93.

¶ 18. We concluded that the officer in *Betow* improperly detained the defendant. *Betow*, 226 Wis. 2d at 92. We first explained the basic interrelationship of a reasonable suspicion justifying a traffic stop and the nature of that initial traffic stop:

> There is no question that a police officer may stop a vehicle when he or she reasonably believes the driver is violating a traffic law; and, once stopped, the driver may be asked questions reasonably related to the nature of the stop—including his or her destination and purpose. Such a stop and

detention is constitutionally permissible if the officer has an "articulable suspicion that the person has committed or is about to commit [an offense]."

*Id.* at 93–94 (citations omitted); *see also Berkemer v. Mc Carty*, 468 U.S. 420, 439 (1984); *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). We then addressed the permissible scope of the subsequent detention:

[T]he scope of the officer's inquiry, or the line of questioning, may be broadened beyond the purpose for which the person was stopped only if additional suspicious factors come to the officer's attention—keeping in mind that these factors, like the factors justifying the stop in the first place, must be "particularized" and "objective."

*Betow*, 226 Wis. 2d at 94 (citation omitted).

¶ 19.   While *Betow* and *Gaulrapp* may each suggest a different result here, we are convinced that *Betow* is more factually analogous. In *Gaulrapp*, when the police asked the defendant if they could search him and his vehicle, the defendant immediately consented. *Gaulrapp*, 207 Wis. 2d at 603. That was not the case here. Like the defendant in *Betow*, Farr did not consent to a search of his vehicle the first time the police officer asked. Like the police officer in *Betow*, Fahrney continued to detain the vehicle after its driver initially refused a search of it.

¶ 20.   The State argues that *Betow* is distinguishable because, in that case, the issue was whether the officer had a reasonable suspicion to detain a vehicle to allow a police dog to assist in a search of it. The State argues that here, the police had reasonable suspicion of drug activity justifying further detention of the men for a dog search. We disagree.

306

¶ 21.   In evaluating reasonable suspicion, we must examine whether all the facts, when taken together, could constitute a reasonable suspicion. *State v. Allen*, 226 Wis. 2d 66, 75, 593 N.W.2d 504 (Ct. App. 1999). In support of its contention that Fahrney could have reasonably suspected Gammons and the others of drug activity, the State points to the following evidence in the record: the vehicle was stopped in a "drug-related" or "drug crime" area; it was 10:00 p.m.; the vehicle was from Illinois; Fahrney had knowledge of prior drug activity by each of the three men in the vehicle; and Gammons appeared to be nervous and uneasy.

¶ 22.   Again, a comparison to *Betow* is helpful. In *Betow*, the State argued that similar circumstances supported the existence of reasonable suspicion, and we disagreed. *Betow*, 226 Wis. 2d at 95–98. The State pointed to the following facts, arguing they formed the basis for a reasonable suspicion: the defendant's wallet had a picture of a mushroom on it, which the State argued indicated drug activity; the defendant was stopped late at night; the defendant appeared to be nervous; the defendant was returning to Appleton from Madison, a city the State claimed was well known for its drug traffic; and the defendant's story about what he had been doing in Madison seemed implausible to the police officer. *Id.* at 95–97. We concluded that, under those circumstances, the officer could not have formed a reasonable suspicion of drug activity justifying further detention of the defendant for a drug investigation. *Id.* at 98.

¶ 23.   Other than Fahrney's personal knowledge of prior drug activity, the circumstances the State relies on here were all present in *Betow*: an out-of-town vehicle in an area purportedly known for drug activity;

a night-time stop; and a nervous suspect. Moreover, the State does not assert that Gammons or Farr gave an implausible story of his whereabouts like the defendant in *Betow*. Finally, nothing in the record demonstrates that Fahrney observed Gammons or the others say or do anything that specifically indicated drug use or possession on the night of the stop.

¶ 24.   While Fahrney's initial questions may have been permissible under *Griffith* and *Gaulrapp*, no additional suspicious factors suggesting drug activity developed from Farr's responses to Fahrney's initial questions. Therefore, Fahrney had no basis to continue to detain Gammons and the others after Farr stated that the men did not have any drugs and denied Fahrney's first request to search the vehicle. At that point, the Fourth Amendment required Fahrney to terminate the stop and allow Gammons and the other men to continue about their business. Instead, Fahrney continued to detain the vehicle and told Farr he was going to get a police dog to sniff the car. At that moment, the stop was transformed into an unlawful detention, and the State cannot rely on Farr's subsequent consent to search to justify the police actions. Therefore, the drug evidence the police gathered from the subsequent searches was obtained in violation of Gammons' Fourth Amendment rights and should have been suppressed. *See State ex rel. Peckham v. Krenke*, 229 Wis. 2d 778, 786–87, 601 N.W.2d 287 (Ct. App. 1999). On remand, the trial court should grant Gammons' motion to suppress.

¶ 25.   Gammons also argues that although Farr eventually consented to a search of the vehicle, Farr's consent was involuntary because Fahrney threatened to bring in a police dog to sniff the vehicle and because

the police engaged in other coercive tactics. Gammons further argues that the pat-down search of his person was unreasonable under the Fourth Amendment. We need not reach these last two questions because we have already determined that once the stop was transformed into an unlawful detention, the evidence the police subsequently obtained should have been suppressed.

*By the Court.*—Judgment reversed and cause remanded with directions.