STATE of Wisconsin,
Plaintiff-Respondent,

v.

Damian Darnell WASHINGTON,
Defendant-Appellant.

Court of Appeals

*No. 2004AP1957–CR. Submitted on briefs April 5, 2005.
—Decided May 17, 2005.*

2005 WI App 123

(Also reported in 700 N.W.2d 305.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Diana M. Felsmann*, assistant state public defender, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *William C. Wolford*, assistant attorney general.

Before Wedemeyer, P.J., Curley and Kessler, JJ.

¶ 1. CURLEY, J.   Damian Darnell Washington appeals from a judgment convicting him of one count of possession of cocaine, one gram or less, with intent to deliver, and also from an order denying his postconviction motion, which sought reconsideration of the trial court's denial of his suppression motion. Washington agrees with the trial court's determination that the police did not have reasonable suspicion to initially stop him. However, Washington contends that the trial court erred in finding he tossed the evidence before acquiescing to the show of authority, and thus, he argues, the evidence tossed after this illegal seizure must be suppressed as "fruits of the poisonous tree." We agree. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND.

¶ 2.   On August 23, 2003, at approximately 3:00 p.m., Milwaukee Police Officers David Howard and Rudy Gudgeon were on patrol in plain clothes, and in an unmarked squad car, on the 1600 block of West Locust Street to investigate a complaint of loitering and drug sales at an allegedly vacant house. Washington was in front of the house that the police were investigating, and after one of the officers recognized him from past encounters, they ordered him to stop. Washington stopped initially, but also took a few steps backwards and allegedly looked nervous. He then threw his hands up and a towel flew out of his hand. At that point, Washington was pushed to the ground and subdued. One of the officers retrieved the towel and discovered the cocaine, which was in a baggie that had

459

been wrapped in the towel. Washington was charged with one count of possession of cocaine, one gram or less, with intent to deliver.

¶ 3.   At the suppression hearing, Officer Howard testified that he had come into contact with Washington on two prior occasions that August. He also testified that he knew Washington did not live in the area, and had been told by another officer that Washington had been apprehended for narcotic sales in the past. Although Officer Howard did not claim to have seen Washington commit a crime before the stop, he did testify that he thought Washington was involved in criminal activity, and wanted to cite him for loitering in front of the house, which he believed was vacant. He testified that he was within two to three feet of Washington when he told him to stop. Washington stopped, "but he . . . had the motion that he wanted to run. I told him not to run; stand there. He continued to look nervous. He wanted to run. At that point, I'm familiar that he – what he may do. I drew my weapon." As Officer Howard got closer, he testified that Washington threw up his hands, with his palms facing backwards, and the towel flew out. Officer Howard proceeded to subdue him and pat him down.

¶ 4.   Washington testified that he was in the area because he had a girlfriend that lived nearby, and he was on his way to the grocery store down the street. He asserted that the house in question was not vacant at all, that he actually knew the people who lived there, and that they were sitting on the porch that day. Washington testified that when he was walking towards the store, the officers pulled up, and the officer on the passenger side opened his door, pulled his gun, and told Washington to freeze. He testified that when the officer told him to freeze, he put his hands up, saw the gun,

and "just got to walking backwards." Washington testified that he asked the officer what he had done, and the officer replied: "Stop, don't move. If you run, we'll shoot you in your back." At that point, he testified that one of the officers pushed him down, and the other searched him. Washington also testified that he had been in contact with one of the officers on a prior occasion, and that this officer had warned him: "I know what you're doing out there, and I'm going to have you in prison again before the summer is over with."

¶ 5. On cross-examination, Washington clarified that the officers did not have their guns pulled immediately, and that he stopped when the police told him to, but started walking backwards when he saw the guns. He testified that his hands were in the air and the towel fell to the ground when one of the officers pushed him down.

¶ 6. The State argued that, under the circumstances as described by the police, Officer Howard had a reasonable suspicion to stop Washington, given what he knew about Washington, the area, and the house. Washington argued that the critical question was whether the officers had a "right to tell the defendant to stop." He insisted that he was walking down the street, which he had a right to do, and was spotted in front of the house. He was told to stop, and he did. Washington argued that regardless of whether he had been arrested before, and what the officer may have thought of him and the house, this particular stop was unreasonable. As such, he insisted that the stop was illegal, and everything discovered subsequent to that should be suppressed.

¶ 7. After considering the testimony, the trial court found the initial stop unreasonable. First, the trial court found that there was nothing in the record to clearly demonstrate that the house was vacant. Second,

it found that the officer had had contact with Washington on more than one prior occasion, and that he had been informed at some point that Washington and his brother previously had been arrested for drug dealing. Next, the trial court found that the location of the incident is a high crime area. However, the trial court also addressed the complaint which brought the officers to the area, stating that there was no indication as to when it was made, who made it, and who was potentially involved, and that "[t]here is no indication of why the person who was calling would have a reasonable belief of any sort that drug trafficking was occurring." The trial court also found that, on that day, Washington was standing near the porch, at the same house where Officer Howard had seen Washington before, talking to two individuals, and although the officers were traveling in an unmarked car, it was clearly visible as a police vehicle because of the Kojak light on the roof. The trial court then continued, finding that the stop, when viewed objectively, was not based on a reasonable articulable basis:

> That as [the officers] were traveling, the three individuals noticed them. They all began to disburse [sic] immediately upon seeing the police. The defendant walked south on 16th Street and turned west on Locust, and the officer stopped, got out of the vehicle. And when he got out of the vehicle, he immediately told the defendant to stop.

> At this point, the Court's going to conclude that there was no reasonable articulable basis to believe that the defendant was committing a crime or was about to commit a crime that would justify a *Terry* stop.[1] There's no – the officer, although he testified that he was going to cite the defendant for loitering, there is

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

no proof that's submitted regarding what the City of Milwaukee ordinance is regarding loitering, what the elements of that loitering were. And merely the officer's belief that a loitering ordinance was violated isn't a basis for this Court to conclude that there is a reasonable articulable suspicion. It's not a subjective standard. It is an objective standard of whether a reasonable person would consider that a crime was being committed.

However, the trial court then remarked:

The officer immediately called out to the defendant to stop. He got out of his squad car. He stated, stop there; I want to talk to you. He intended to cite the defendant for loitering. He clearly intended to take him into custody, and he was within two feet of him while he made this announcement.

The defendant initially stopped, looked like he was going to run, and started walking backwards, and it was at that point that the officer drew his gun. The defendant continued walking. The defendant had a towel in his hand. It was a washcloth; that he put his hands and arms up towards his shoulders and threw the towel out of his hand, and then he stopped. At that point, the defendant was pushed down to the ground and the towel was retrieved.

The Court is going to find that the defendant did not stop in response or comply with the show of authority by the police; that, therefore, there was no seizure prior to the time the defendant threw the towel out of his hand.

At that point, the Court is going to find that there is a reasonable articulable suspicion that the defendant was engaged in criminal activity, possibly drug activity. It's consistent with somebody who is involved with

463

drugs, possessing drugs, or selling drugs to try and dispose of them at the time the officers are approaching them.

Thus, after noting the other surrounding circumstances, the trial court concluded that, at that point, a *Terry* stop was justified. Finally, the trial court surmised that

[e]ven if there wasn't a basis to stop the defendant with a *Terry* stop, the defendant lost all control and rights regarding the towel and the substance that was found afterwards, and when the towel was retrieved, the officers had probable cause to arrest the defendant at that time. And, therefore, there was not a search . . . of the defendant that recovered the drugs.

The trial court concluded that having thrown the drugs away, Washington had "no reasonable expectation of privacy for them," and "[t]here was then probable cause not only to stop him, but to arrest him." As such, the trial court denied the motion to suppress. Washington subsequently pled guilty, and was sentenced to four years imprisonment, consisting of two years of initial confinement and two years of extended supervision.

¶ 8.  Washington filed a postconviction motion requesting reconsideration of the denial of the suppression motion. He insisted that because the police did not have reasonable suspicion to stop him, and because he stopped in response to the police order to do so, the washcloth and drugs found after the illegal seizure should have been suppressed as fruits of the poisonous tree. Washington contended that the trial court's conclusion that no seizure occurred until after he threw the washcloth to the ground was an unreasonable extension of controlling case law. He argued that his liberty was restrained when he was ordered to stop by Officer

Howard, and that he did indeed stop and acquiesce to the show of authority, even though he took a few steps backwards. Washington also differentiated his case from *California v. Hodari D.*, 499 U.S. 621 (1991), to which the trial court referred during the suppression hearing. He argued that in that case, because the defendant fled from the police and tossed the drugs before being apprehended, the Supreme Court concluded that the defendant was not seized before throwing the drugs. To the contrary, Washington insisted that his case is distinguishable in that he did stop and was clearly seized before the drugs were tossed, and as such, the evidence should be suppressed as fruits of an illegal stop.[2]

¶ 9. The trial court denied the motion without a hearing, concluding:

> At the hearing, the court found that the defendant did not stop in response to a show of authority by police and that therefore no seizure occurred prior to the time the defendant threw away the washcloth. The court concluded that *at that point* the officers had reasonable suspicion that the defendant was engaged in drug activity based upon his conduct (disposing of the washcloth as the officers were approaching), what the officers already knew about the defendant, and the fact that the washcloth was bundled up in his hands and not a loose towel that one would use to wipe away sweat on a hot day (as the defendant claimed). Even if there was no reasonable suspicion for a stop, the court concluded that the defendant lost any reasonable expectation of

---

[2] Washington also insisted that should the trial court find that he waived his right to present the argument that *California v. Hodari D.*, 499 U.S. 621 (1991), is not controlling and that the washcloth and drugs were fruits of the poisonous tree, he was denied the effective assistance of counsel. The trial court found no ineffectiveness on the part of Washington's attorney.

privacy in the washcloth or its contents when he discarded them, and that the police then had probable cause not only to stop him but to arrest him. The court stands by its findings and conclusions as set forth in the record of the suppression hearing.

In regard to *Hodari D.*, the trial court concluded that *Hodari D.* "does not stand for the proposition that a defendant must give chase when there is a show of authority by police for the court to conclude that no seizure occurred." It reasoned that the Supreme Court held that a "seizure of a person" "means either the application of physical force, or, where that is absent, submission to an officer's show of authority to restrain the subject's liberty." The trial court went on to explain that no physical force was applied prior to Washington throwing the washcloth, that Washington did not comply with the officer's show of authority for the reasons it stated on the record, and thus "the abandoned washcloth and drugs were not the fruit of a seizure." Washington now appeals.

## II. ANALYSIS.

¶ 10. Washington contends that the trial court erred in denying his motion to suppress and insists that "because the police did not have reasonable suspicion to stop him, and because he stopped in response to the police order to do so, the evidence tossed after this illegal seizure must be suppressed as fruits of the poisonous tree." He disagrees with the trial court's conclusion that he did not comply with the show of police authority, arguing that "[w]hen [the] police, without lawful authority, ordered him to stop, *he stopped going along his way*. Even the trial court found 'the defendant initially stopped.' " (Emphasis in brief.) He contends that while he may have taken a few steps

backward, that was "a natural reaction to someone pointing a gun at him," and that he was seized the moment police ordered him to stop and he did so. As such, Washington insists that the washcloth and drugs were found as a result of an illegal stop, and should have been suppressed as fruits of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963).[3]

¶ 11.   When reviewing a trial court's ruling on a motion to suppress evidence, we will uphold the trial court's factual findings unless they are clearly erroneous. *State v. Eskridge*, 2002 WI App 158, ¶ 9, 256 Wis. 2d 314, 647 N.W.2d 434. We independently decide, however, whether the facts establish that a particular search or seizure occurred and, if so, whether it violated constitutional standards. *See State v. Richardson*, 156 Wis. 2d 128, 137–38, 456 N.W.2d 830 (1990). Accordingly, what we must determine here is:   (1) when Washington was seized, and (2) whether the seizure was reasonablewhether the officers had reasonable suspicion to stop him at that point.

¶ 12.   The Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution guarantee citizens the right to be free from "unreasonable searches and seizures." *Id.* at 137. Our supreme court consistently follows the

[3] Washington also argues that "[i]f this court finds that [he] waived his right to present the arguments that *Hodari* is not controlling and that the wash cloth and drugs were fruits of the poisonous tree, [he] was denied the effective assistance of counsel." Because the trial court addressed the *Hodari* contention in its postconviction order, and the State has not argued waiver, asserting only that Washington's claims on appeal are without merit and he therefore could not establish ineffective assistance, we will not consider the waiver issue any further.

United States Supreme Court's "interpretation of the search and seizure provision of the [F]ourth [A]mendment in construing the same provision of the state constitution." *Id.*

¶ 13.  In *United States v. Mendenhall*, 446 U.S. 544 (1980), the Supreme Court stated that "[w]e adhere to the view that a person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained[,]" *id.* at 553, and concluded that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave[,]" *id.* at 554. In *Hodari D.*, a case in which the defendant fled at the approach of an unmarked police car, Hodari, turning to see that a police officer was almost upon him, tossed a rock of crack cocaine, and was eventually tackled by the police officer who chased him down. There, the Supreme Court was faced with the question of when the seizure actually occurred. The lower court held that Hodari had been seized when he saw the police officer running towards him. The state argued otherwise, and petitioned for certiorari. The Supreme Court framed the issue as "whether, at the time he dropped the drugs, Hodari had been 'seized' within the meaning of the Fourth Amendment[,]" 499 U.S. at 623 (footnote omitted), and thus, "whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield[,]" *id.* at 626, concluding that "it does not[,]" *id.*[4]

---

[4] Our supreme court has indicated that it "will follow the *Hodari D.* standard for when a seizure occurs." *State v. Kelsey C.R.*, 2001 WI 54, ¶ 33, 243 Wis. 2d 422, 626 N.W.2d 777. While

¶ 14. In that case, there was no question as to whether Hodari fled from the police. He did, and as such, the Supreme Court concluded that since he did not yield to a show of authority, he was not seized until he was tackled by the police officer. Here, we cannot conclude that Washington, like Hodari, fled from the officer's show of authority and was not seized until he was subdued by the police. The trial court found that Washington stopped when ordered to do so. Though he also continued to take a few steps backwards, and the officer may have thought that he might run, that does not equate his actions with fleeing. Indeed, he stopped and addressed the police, allegedly inquired as to what he had done,[5] and eventually threw his hands up in the air. He stopped walking towards the store, or wherever he was going, when the police stopped within a few feet of him, and ordered him to stop. We cannot conclude, under these facts, that Washington did not yield until after he threw his hands in the air.

¶ 15. Now that we have determined that he was seized when he initially stopped after the police commanded him to do so, the relevant inquiry becomes whether the seizure was reasonable and justified. While the Fourth Amendment prohibits unreasonable searches

*Kelsey C.R.* was a case concerning a seizure conducted under the community caretaker function, this court has also employed the *Hodari D.* standard in a *Terry* stop case. *See State v. Young,* 2004 WI App 227, 277 Wis. 2d 715, 690 N.W.2d 866, *review granted,* 2005 WI 21, 278 Wis. 2d 535, 693 N.W.2d 75.

[5] Though Washington testified that he asked the officer what he had done, and on cross-examination, Officer Howard testified that "[h]e could have said that[,]" the trial court did not make a finding in regard to this fact.

and seizures, "the [Supreme] Court [has] recognized the legitimacy of an investigative stop as effectively meeting government interests in crime prevention and protection . . . : '[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.' " *Richardson*, 156 Wis. 2d at 138 (quoting *Terry*, 392 U.S. at 22).

¶ 16.  Thus, the standard for a valid investigatory stop is less than that for an arrest; an investigatory stop requires only "reasonable suspicion." *See State v. Allen*, 226 Wis. 2d 66, 70–71, 593 N.W.2d 504 (Ct. App. 1999). The reasonable suspicion standard requires the officer to have " 'a particularized and objective basis for suspecting the person stopped of criminal activity[,]' " *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (citation omitted); reasonable suspicion cannot be based merely on an "inchoate and unparticularized suspicion or 'hunch[,]' " *Terry*, 392 U.S. at 27. When determining if the standard of reasonable suspicion was met, those facts known to the officer at the time of the stop must be taken together with any rational inferences, and considered under the totality of the circumstances. *See Richardson*, 156 Wis. 2d at 139–40. Stated otherwise, to justify an investigatory stop, "[t]he police must have a reasonable suspicion, grounded in specific articulable facts and reasonable inferences from those facts, that an individual is [or was] violating the law." *State v. Gammons*, 2001 WI App 36, 6, 241 Wis. 2d 296, 625 N.W.2d 623. However, an officer is not required to rule out the possibility of innocent behavior before initiating a brief investigatory stop. *State v. Anderson*, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990).

¶ 17.    In this case, while we disagree with the trial court's conclusion as to when Washington was actually seized, we do agree with the trial court's preliminary conclusion that at the time the police initially pulled over and told Washington to stop, they lacked the requisite reasonable suspicion. While the officer testified that he was going to cite Washington for loitering, he did not demonstrate a reasonable, articulable basis for doing so. Investigating a vague complaint of loitering and observing Washington in the area near a house that the officer believed to be vacant, even taken in combination with the officer's past experiences with Washington and his knowledge of the area, does not supply the requisite reasonable suspicion for a valid investigatory stop. People, even convicted felons, have a right to walk down the street without being subjected to unjustified police stops.

¶ 18.    Nor are we persuaded by the State's argument that "[a] conclusion that Washington's actions in this case constituted yielding to a show of authority would encourage suspects to flee after the slightest contact with an officer in order to discard evidence and yet still maintain Fourth Amendment protections." As indicated above, this is not a case in which the "suspect" "fled" after having only "the slightest contact with an officer." First, as we concluded above, the officers did not have reasonable suspicion to stop Washington when they pulled over and ordered him to stop. Second, Washington did not flee. The officers stopped the car, presumably within feet of Washington, and ordered him to stop, which he did. The fact that Officer Howard thought that Washington was going to run because he looked nervous and took a few steps backward does not change the fact that Washington initially stopped, al-

legedly asked what he had done, and threw his hands in the air. At the point that he stopped walking toward the store, and submitted to the officer's command that he stop, he had been effectively seized by the police. He did not run and he did not ignore the police. The State's contentions stretch the facts further than is warranted.

¶ 19.   As such, we conclude that the drugs were recovered as the result of an unreasonable stop and an illegal seizure, and thus should be suppressed by virtue of the exclusionary rule. *See Wong Sun*, 371 U.S. at 484–85, 487–88. Accordingly, we reverse the judgment of conviction and remand for further proceedings.

*By the Court.*—Judgment and order reversed and cause remanded.