STATE of Wisconsin, Plaintiff-Respondent,

v.

Clemente Lamont ALEXANDER,
Defendant-Appellant.

Court of Appeals

*No. 2007AP403–CR. Submitted on briefs November 6, 2007.
—Decided December 18, 2007.*

2008 WI App 9

(Also reported in 744 N.W.2d 909.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Michael C. Demo* of *Wagner, Falconer & Judd, Ltd.,* of Brookfield.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen,* attorney general and *Michael J. Loose,* assistant attorney general.

Before Curley, P.J., Wedemeyer and Kessler, JJ.

¶ 1. WEDEMEYER, J. Clemente L. Alexander appeals from a judgment entered after he pled guilty to possession with intent to deliver cocaine and marijuana. He also appeals from an order denying his motion for reconsideration. He claims the trial court erroneously exercised its discretion when it denied his motion to suppress. Because the totality of the circumstances support the police officer's reasonable suspicion to conduct the pat-down and protective search, we affirm.

## BACKGROUND

¶ 2. On February 9, 2000, at approximately 9:19 p.m., Alexander was riding in the front passenger seat of a car driven by a woman named Peggy Brown. A man

named Bryan Winters was in the backseat. The car was driving on 27th Street toward Capitol Drive and passed by a marked police car. Milwaukee Police Officers Dean Newport and William Sheehan were parked in the police car, in the 4000 block of North 27th Street. They were assigned to that area due to recent "shots-fired" complaints. As they were watching the area, they noticed a silver Dodge Stratus drive past them and proceed to the stoplight at North 27th and West Capitol Drive. As the car approached the intersection, the stoplight turned red and the Stratus turned right through the red light without stopping. The officers proceeded to follow the Stratus with the intent to pull the vehicle over for the traffic violation. The officers activated the squad's emergency lights in the 2800 block of West Capitol. The Stratus did not immediately pull over and stop. The vehicle did eventually stop in the 3000 block of West Capitol.

¶ 3.   During the time the squad followed the Stratus, Newport indicated that he noticed three people in the car, later identified as Brown, Alexander and Winters. Newport stated that he saw Alexander and Winters making furtive movements as though each was giving something, or receiving something from the other. Newport then saw Alexander turn back towards the front of the car and lean forward towards the glove compartment. Alexander also appeared to lean toward Brown, who lifted herself up as if to allow Alexander to place something under her, or in her seat. After the furtive movements stopped, the car pulled over. Based on the furtive movements, the delay in pulling over, the high-crime area, and the time of day, Newport believed, based on his prior experience, that such circumstances usually result in weapons in the car. The officers called for backup. The officers then proceeded to immediately

326

have the occupants exit the vehicle and conducted a pat-down. They started with Winters, patted him down and did not find any weapons. Then they asked Alexander to exit and he initially refused. He then complied and a pat-down did not reveal any weapons on Alexander. Then Brown was asked to exit and a pat-down was conducted. No weapon was found, but officers did observe a bottle of air freshener, some papers, and the auto manual on the driver seat—items typically kept in the glove compartment. The officers then searched the glove compartment of the vehicle and discovered a gun, and a large amount of cocaine and marijuana.

¶ 4. Alexander was charged based on his alleged possession of these items. The case was tried to a jury, which found Alexander guilty. Alexander filed a postconviction motion, alleging ineffective assistance of trial counsel. The trial court denied the motion, but this court reversed for a *Machner* hearing.[1] *State v. Alexander*, No. 2002AP2669–CR, unpublished slip op. (WI App Sept. 22, 2003). On remand, the trial court held the evidentiary hearing and then concluded that Alexander had received effective assistance of counsel. Alexander appealed, and we reversed the trial court's decision, ruling that Alexander's trial counsel was deficient and that Alexander was prejudiced. We remanded for a new trial. *State v. Alexander*, No. 2004AP1064–CR, unpublished slip op. (WI App Apr. 19, 2005).

¶ 5. On remand, Alexander filed a motion seeking to suppress evidence, which was denied. He then pled guilty and was sentenced to a period of probation with a stayed sentence. He moved the trial court to reconsider

---

[1] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

its decision denying his suppression motion. The trial court declined. Alexander now appeals.

## DISCUSSION

¶ 6.   The issue in this case is whether the trial court erred in finding that reasonable suspicion existed for dangerousness to require the defendant to get out of the car, pat him down, handcuff him, and search the glove compartment. We are not convinced that the trial court erred based on the totality of the circumstances and the trial court's analysis of credibility.

¶ 7.   " 'Whether evidence should be suppressed is a question of constitutional fact.' " *State v. Knapp*, 2005 WI 127, ¶ 19, 285 Wis. 2d 86, 700 N.W.2d 899 (citation omitted). "A finding of constitutional fact consists of the circuit court's findings of historical fact, and its application of these historical facts to constitutional principles. We review the former under the clearly erroneous standard, and the latter independently." *State v. Johnson*, 2007 WI 32, ¶ 13, 299 Wis. 2d 675, 729 N.W.2d 182.

¶ 8.   In *Johnson*, our supreme court recently addressed the issue of whether evidence should be suppressed following an investigative stop triggered by a traffic violation and furtive movements. *Id.*, ¶ 12. The court reiterated the legal principles applicable to investigative stops:

> During an investigative stop, an officer is authorized to conduct a search of the outer clothing of a person to determine whether the person is armed if the officer is "able to point to specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 211 . . . The test is an objective one:  "[W]hether a reasonably prudent [officer] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger" because the person may be armed with a weapon and dangerous.

*Johnson*, 299 Wis. 2d 675, ¶ 21 (brackets in *Johnson*). An officer's "hunch" is insufficient to satisfy the standard, but the officer may "draw from the facts in light of his [] experience." *Id.* These cases are fact-intensive and must be decided on a " 'case-by-case basis, evaluating the totality of the circumstances.' " *Id.*, ¶ 22 (citation omitted). Thus, the standard we look at is whether the officer conducting the protective search had reasonable suspicion to believe that the person was dangerous and may have had immediate access to a weapon. *Id.*

¶ 9.  In *Johnson*, the court concluded that the facts were insufficient to satisfy that standard. *Id.*, ¶ 48. In *Johnson*, the officers saw a vehicle fail to signal for a turn, the vehicle had been stopped three days earlier for a suspended registration due to an emissions violation. *Id.*, ¶ 40. The officers activated the police vehicle's lights and sirens and pulled the car over. *Id.*, ¶¶ 2–3. As they were doing so, the officers saw two persons inside the car and noticed that the driver leaned forward as if he was putting something under the seat. *Id.*, ¶ 3. When the officers approached, they advised the driver that he was stopped for the emissions violation. *Id.*, ¶ 4. Johnson responded that the emissions issue had been resolved and produced paperwork to support that representation. *Id.* The officer was satisfied by the paperwork. *Id.* The officer then asked Johnson to step out of the car and proceeded to pat-

329

down Johnson. *Id.*, ¶¶ 5–6. Based on this set of facts, the supreme court held that the circumstances did not demonstrate a reasonable suspicion of dangerousness. The court reasoned that the issue triggering the stop had been resolved to the officer's satisfaction, and therefore the "generalized concern for safety" no longer existed. *Id.*, ¶ 45 n.17.

¶ 10. In the instant case, the facts are distinguishable from *Johnson*. Officer Newport testified about the high-crime area, stating that it was an area of violent crime, drug dealing, and active gangs. A number of homicides, attempted homicides, and shootings had occurred in this area, which Newport had five years of experience in patrolling. He had personally encountered armed criminals in the area, and was parked there on the evening of Alexander's stop due to "shots-fired" complaints, some of which were drive-by shootings.

¶ 11. In addition, Newport testified that when the squad car activated its emergency lights, signaling the vehicle Alexander was riding in, to pull over, the vehicle did not immediately do so. Rather, it pulled into the right lane and slowed down, but failed to stop for two blocks. Newport testified that cars normally pull over within one-half of a block when being stopped by the police. The delay in stopping raised suspicion for the officers that the occupants were trying to buy time to conceal weapons or contraband. During this time, the officers also observed furtive movements by the occupants. Two of the occupants were looking back at the squad car, and the officers observed Alexander and Winters move their bodies as if they were exchanging an item from the front to the back or vice versa. Then Alexander moved forward as if placing/retrieving items into/from the glove compartment. They also noticed that Alexander turned towards the driver, who then leaned toward the driver's window,

so as to allow Alexander to place something on her seat or between her seat and the console. Immediately after that Alexander "snaps to an erect position" and the car finally stopped.

¶ 12. Newport, based on the uncertainty of the situation and similar experiences, believed that there was a weapon in the car. Newport ordered Winters out first and patted him down for weapons. Then Alexander was asked to exit the vehicle and was patted down for weapons. Due to some uncooperative behavior, Alexander was handcuffed. Then, Brown was ordered out of the car and the officers noticed she had been sitting on an air freshener, a stack of papers and the auto manual, things ordinarily kept in the glove compartment. The officers searched the glove compartment and found a loaded gun and large amounts of cocaine and marijuana.

¶ 13. Based on the totality of the specific facts in the instant case, we conclude that the officers had a reasonable suspicion of dangerousness to justify the pat-down and protective search. First, the officer's concern for their safety was evident by the immediate pat-down, rather than, as in *Johnson*, the first concern was the emissions violation. Second, unlike in *Johnson*, the traffic violation here was not resolved before any pat-down was conducted. Third, the instant case occurred in a high-crime area, known for violent crimes and weapons, at a time when the police were on alert due to recent "shots-fired" complaints. Fourth, the occupants here engaged in repeated furtive movements prior to complying with police directive to stop their vehicle. Finally, the protective search of the glove compartment was done only after the officers observed items, normally found in the glove compartment, on the

driver's seat. Discovering these items there, consistent with the furtive movements the officers had observed, and the delay in pulling over, led to reasonable suspicion that Alexander was hiding a weapon in the glove compartment.

¶ 14. We acknowledge that there are facts in the record indicating the testimony of Brown that she stopped the vehicle as soon as she could in traffic conditions and testimony from Alexander that although he looked back at the squad car, he made no other furtive movements. This testimony obviously conflicts with the testimony of the officers. However, the trial court found the officers' version of events to be more credible and there is substantial evidence in the record to support that credibility finding. Accordingly, this court upholds the trial court's credibility determination.

¶ 15. These cases are not easy matters to decide. We must balance the right of citizens to be free from unreasonable government intrusions and guard against the police overstepping their authority, with the safety of law enforcement officers who are patrolling dangerous areas and approaching vehicles in a society where assaults on officers by armed suspects are increasing daily. *See Johnson*, 299 Wis. 2d 675, ¶ 22; *State v. McGill*, 2008 WI 38, ¶ 20, 234 Wis. 2d 560, 609 N.W.2d 795. We are convinced that the officers in the instant case had sufficient particularized facts to raise a reasonable suspicion that the situation was dangerous, and that the occupants of the vehicle may have had a weapon. We base our decision on the following factors: (1) the officers were in the area due to "shots fired" complaints and knew the area to be very violent, with substantial drug and gun activity; (2) the numerous furtive gestures of the occupants of the car observed

by the officers before the car stopped; (3) the delay in stopping raising the suspicion of the officers that the occupants were buying time to hide weapons; (4) the officers belief that the situation was dangerous based on the occupants actions immediately upon stopping the car; (5) the items observed on the driver's seat and the reasonable inferences that could be drawn therefrom; (6) the protective search being the first priority over the traffic stop; and (7) the trial court's credibility determinations.

¶ 16. There seems to be a common factor in some of these cases, where the courts have concluded that the officers did not have justifiable basis for conducting a protective sweep—that factor being when the protective search takes place *after* the traffic investigation has been completed. *See Johnson*, 299 Wis. 2d 675, ¶¶ 45, 48, *State v. Gammons*, 2001 WI App 36, ¶¶ 1, 24, 241 Wis. 2d 296, 625 N.W.2d 623. As noted, such was not the case here—the facts and circumstances demonstrate that the officers' primary concern was indeed weapons and safety, as evidenced by the fact that the protective search was the first thing the officers did. The protective search was not an afterthought, but the first concern. The facts and circumstances presented above demonstrate that the high-crime area in the instant case was only one of several factors justifying the officers' actions.

¶ 17. In sum, we conclude that based on the totality of the factors in this case, the officers had reasonable suspicion to be concerned about their safety. The patdown conducted and the protective search was based on specific and articulable facts, which taken together with all inferences arising from such facts, justified the actions of the officers. The circumstances warranted a reasonably prudent belief that the vehicles occupant may

have been armed, and the situation was dangerous. Accordingly, we affirm the trial courts decision denying the motion to suppress.[2]

*By the Court.*—Judgment and order affirmed.

---

[2] Alexander raises the additional issue that he was under "constructive arrest" because he was handcuffed. We decline to address this issue as Alexander waived it by failing to raise it in a timely fashion during the trial court's original consideration of the suppression issue. *See State v. Damon*, 140 Wis. 2d 297, 300, 409 N.W.2d 444 (Ct. App. 1987). We are further not convinced that handcuffing Alexander had any causal connection to the discovery of the gun or drugs. The officers searched the glove compartment as a reasonable part of the protective search based on the facts and circumstances of this case. Neither the drugs nor the gun were found on Alexander's person. The manner of securing him, therefore, has no bearing on whether or not the evidence should be suppressed. *See United States v. Ramirez*, 523 U.S. 65, 72 n.3 (1998); *Segura v. United States*, 468 U.S. 796, 815 (1984).