# COURT OF APPEALS
# DECISION
# DATED AND FILED

## November 16, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1228-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF104

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

DAVID RAY ROBERTS,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Crawford County: LYNN M. RIDER, Judge. *Affirmed.*

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   David Roberts appeals a judgment of conviction based on his no-contest plea to one count of possession of amphetamine with intent to deliver.   Roberts contends that the circuit court erred by denying his motion to suppress evidence obtained when a sheriff department's deputy patted him down and searched his vehicle.   Roberts argues that the evidence was discovered based on a seizure that was unsupported by reasonable suspicion.   For the reasons set forth in this opinion, we conclude that the circuit court properly denied the suppression motion.   We affirm.

*Background*

¶2      In November 2017, Roberts was charged with possession of methamphetamine with intent to deliver and possession of drug paraphernalia. Roberts moved to suppress the evidence against him on grounds that it was obtained through an illegal search and seizure.   At the suppression hearing, the arresting deputy testified as follows.

¶3      During a nighttime patrol, the deputy observed a white van driving towards him into the Village of Gays Mills.   The deputy ran the van's license plates and was informed by dispatch that the license plates were not registered to a white van.

¶4      The deputy turned his squad car around so that he could follow the van.   By the time the deputy turned around, the van had turned off the road. Within several minutes of first spotting the van, the deputy observed the van parked on a side street with all of its lights off.

¶5      The deputy parked his squad car directly behind the van, but did not activate his emergency lights or siren.   As the deputy approached the van to make

contact, he learned from dispatch that the van's license plates were, in fact, registered to a white van.

¶6     The deputy looked inside the van with his flashlight and saw that there was no one in the front seat. The deputy then observed Roberts in the back passenger seat. Roberts responded to the deputy's flashlight but appeared "groggy" and as if he was having difficulty opening his eyes. The deputy also observed two women on the floor of the van in the rear middle aisle, who were "ducked down" and lying on top of each other. In addition, the deputy observed a machete inside the van.

¶7     The deputy asked Roberts to open the door, and Roberts slid the door open. The deputy noted that Roberts had droopy eyelids. The deputy asked the occupants of the van why they were hiding and what they were doing there. One of the women responded that they were lost. The deputy also asked if any of the occupants of the van were on probation, and Roberts responded that he was on probation for a conviction that was related to methamphetamine.

¶8     The deputy then "had" Roberts exit the van. The deputy performed a pat-down of Roberts, which led to the discovery of methamphetamine in Roberts' pocket. A subsequent search of the van led to the discovery of other drugs and drug paraphernalia.

¶9     The circuit court ruled that Roberts' constitutional rights were not violated and on that basis denied the suppression motion. Roberts pled no-contest to possession of methamphetamine with intent to deliver, and the paraphernalia charge was dismissed and read in for sentencing purposes. The court sentenced Roberts to three years of initial confinement and three years of extended supervision. Roberts appeals.

*Discussion*

¶10     On our review of a motion to suppress, we apply a mixed standard of review.  *See State v. Felix*, 2012 WI 36, ¶22, 339 Wis. 2d 670, 811 N.W.2d 775.  We uphold the circuit court's findings of fact unless they are clearly erroneous.  *Id.*  We independently determine whether and when a seizure occurred under the Fourth Amendment.  *State v. Young*, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729.   We also independently determine whether the facts meet constitutional standards.  *Id.*

¶11     The Fourth Amendment of the United States Constitution and article I, section 11 of the Wisconsin Constitution protect the right to be free from unreasonable searches and seizures.  *Id.*, ¶18.  "An investigatory stop is constitutional if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed."  *Id.*, ¶20.  Evidence that was obtained through an unconstitutional search or seizure is generally suppressed under the exclusionary rule, to deter Fourth Amendment violations.  *State v. Dearborn*, 2010 WI 84, ¶35, 327 Wis. 2d 252, 786 N.W. 2d 97.

¶12     "[A] person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that [the person] was not free to leave."  *County of Grant v. Vogt*, 2014 WI 76, ¶20, 356 Wis. 2d 343, 850 N.W.2d 253 (internal quotation marks and citation omitted).  If a person interacting with police "remains free to … walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  The test of whether a seizure has occurred is objective and "considers whether an

innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances." *Vogt*, 356 Wis. 2d 343, ¶¶25, 30.

¶13 A seizure may occur "by means of physical force or show of authority." *Id.*, ¶20 (citation omitted). For a seizure to occur without physical force, "an officer must make a show of authority, and the citizen must actually yield to that show of authority." *State v. Kelsey C.R.*, 2001 WI 54, ¶33, 243 Wis. 2d 422, 626 N.W.2d 777. "Yet, not every display of police authority rises to a 'show of authority' that constitutes a seizure." *Young*, 294 Wis. 2d 1, ¶65. "A police officer's actions must be assessed in view of all the circumstances surrounding the incident" to determine if the actions would "cause a reasonable person to believe that [the person] was not free to leave." *Id.*

¶14 Roberts argues that he was seized under the Fourth Amendment when the deputy "ordered" him to open the van door and speak with him after shining his flashlight into the vehicle. Roberts argues that the deputy's conduct was a display of authority such that a reasonable person would not have felt free to ignore the deputy. Alternatively, Roberts argues that he was seized when the deputy questioned him as to why he was hiding, why he was there, and whether he was on probation. Roberts then asserts that, even if a seizure had not yet occurred at that point, Roberts was clearly seized once he was ordered out of the van and patted down for weapons.

¶15 Roberts argues that this case is distinguishable from *Vogt*. There, our supreme court held that Vogt was not seized when a police officer knocked on Vogt's car window and motioned for him to roll the window down, and Vogt complied. *Vogt*, 356 Wis. 2d 343, ¶¶2-3. The *Vogt* court concluded that "a law enforcement officer's knock on a car window does not by itself constitute a show

5

of authority sufficient to give rise to the belief in a reasonable person that the person is not free to leave." *Id.*, ¶3. Here, Roberts argues, the facts are "significantly more intimidating." He contends that the deputy "actually order[ed]" him to open the door and then "immediately began interrogating" him as to why he was "hiding," why he was there (where he was legally parked), and whether he was on probation. Roberts contends that a reasonable person would not have felt free to ignore the deputy or terminate the encounter.

¶16    Roberts also contends that the deputy lacked reasonable suspicion at any point until he discovered methamphetamine in Roberts' pocket, after he had ordered Roberts out of the van and patted him down for weapons. He contends that the only facts that could have supported reasonable suspicion prior to that point were the following: (1) the encounter took place during nighttime hours; (2) the van had parked and turned its lights off before the deputy had time to turn around, search, and then find it; and (3) there were three occupants in the van, one asleep in a rear seat and two lying on top of each other on the floor. He argues that those facts, taken together, do not amount to reasonable suspicion that criminal activity was afoot. *See State v. VanBeek*, 2021 WI 51, ¶28, 397 Wis. 2d 311, 960 N.W.2d 32. In support, Roberts cites cases in which we have found that a traffic stop late at night, in connection with an area associated with drug activity, plus a nervous suspect, did not support reasonable suspicion to extend the stop for a drug investigation. *See State v. Gammon*, 2001 WI App 36, 241 Wis. 2d 296, 625 N.W.2d 623; *State v. Betow*, 226 Wis. 2d 90, 593 N.W.2d 499 (Ct. App. 1999). Roberts also argues that the fact that he was on probation for a drug offense, alone, did not provide reasonable suspicion. *See State v. House*, 2013 WI App 11, ¶10 n.2, 350 Wis. 2d 478, 837 N.W.2d 645.

6

¶17 We now apply the pertinent legal standards to the undisputed facts at the suppression hearing.[1] Based on that analysis we conclude that Roberts was not seized under the Fourth Amendment until the deputy "had" him step out of the van. Prior to that point, the deputy did not make a display of authority that would have caused a reasonable person in Roberts' position to believe that he was not free to leave.

¶18 The facts regarding the deputy's initial contact with Roberts are sufficiently analogous to **Vogt** that **Vogt** defeats Roberts' argument that he was seized when the deputy first made contact with him. As in **Vogt**, the deputy in this case pulled behind Roberts' van after it was already parked, leaving Roberts ample room to drive away. *See **Vogt***, 356 Wis. 2d 343, ¶41 ("Although [the deputy] parked directly behind Vogt and allegedly there were obstacles on three sides of Vogt's vehicle, these facts do not demonstrate that Vogt was seized because he still could have driven away."). Additionally, as in **Vogt**, there was no evidence that the deputy "ordered" Roberts to open the van door and to speak with him. *See id.*, ¶43 & n.18 (concluding that the deputy did not "command" Vogt to roll down his window by knocking on the window and motioning for Vogt to roll the window down; "[t]hus, Vogt's arguments that he was seized due to a 'command' from [the deputy were] unavailing"). Here, the deputy shined his flashlight into the van and "asked" Roberts to open the van door. As in **Vogt**, at that point, there was no show of authority by the deputy that would have signaled to a reasonable

---

[1] The circuit court did not make extensive factual findings. "However, if a circuit court fails to make a finding that exists in the record, an appellate court can assume that the circuit court determined the fact in a manner that supports the circuit court's ultimate decision." ***State v. Martwick***, 2000 WI 5, ¶31, 231 Wis. 2d 801, 604 N.W.2d 552. Here, the record reveals the specific facts that we now discuss in the text, which support the circuit court's decision to deny the suppression motion.

7

person that the person was not free to decline that request. *See id.*, ¶53 ("Although it may have been Vogt's social instinct to open his window in response to [the deputy's] knock, a reasonable person in Vogt's situation would have felt free to leave.").

¶19    We also conclude that Roberts was not seized after he slid open the van door and the deputy asked him why he was hiding, what he was doing there, and whether he was on probation. "Questioning by law enforcement officers does not alone effectuate a seizure." *State v. Williams*, 2002 WI 94, ¶22, 255 Wis. 2d 1, 646 N.W.2d 834. Rather, "a person has the choice to refuse an officer's attempt to converse … or respond by talking to the officer …. Only when the officer forecloses the choice by the way in which [the officer] exercises [the officer's] authority" does the interaction amount to a seizure under the Fourth Amendment. *Vogt*, 356 Wis. 2d 343, ¶52. Here, the facts do not support a conclusion that the deputy's questions foreclosed Roberts' choice to refuse the deputy's attempt to converse.

¶20    We conclude, however, that Roberts was seized when the deputy "had" Roberts exit the van. We understand the deputy's testimony that he "had" Roberts exit the van as indicating that he in some manner commanded or directed Roberts to do so. At that point—after Roberts acquiesced to the deputy's request to open the van door and answered the deputy's questions as to why he was hiding, what he was doing there, and whether he was on probation—a reasonable person in his position would not have felt free to disregard the deputy's order to exit the van.

¶21    We turn, then, to whether the seizure was supported by reasonable suspicion. We conclude that it was.

¶22    "Reasonable suspicion requires that a police officer possess specific and articulable facts that warrant a reasonable belief that criminal activity is afoot." *Young*, 294 Wis. 2d 1, ¶21.  Here, the specific facts known to the officer included the following.  The van was travelling during nighttime hours when, upon seeing a marked squad car turn around to follow in its direction, the van immediately turned off onto a side street, parked, and turned off its lights.  Within a few minutes, all of the occupants were in the backseat of the van.  Roberts appeared unconscious and the other two occupants were "ducked down" on the floor.  The occupants told the officer they were "lost," but that statement could have been reasonably construed as inconsistent with the events and the unusual behavior that the deputy had observed.  Roberts' visual appearance suggested that he may have been intoxicated—he appeared to have difficulty keeping his eyes open and had droopy eyelids—and Roberts was on probation for a drug-related offense.  All of those facts, together, established a reasonable suspicion that Roberts had committed a crime by operating a vehicle after consuming a controlled substance.

¶23    We also conclude that the deputy had reasonable suspicion to perform a pat-down of Roberts.[2]  "During an investigatory stop, an officer is authorized to conduct" a pat-down "to determine whether the person is armed if the officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"

---

[2] Roberts does not develop a separate argument that the deputy did not have reasonable suspicion to support the pat-down.  Rather, he argues only that the officer lacked reasonable suspicion for a seizure until after the pat-down.  However, the State argues that both the seizure and the pat-down were constitutional.  For the sake of completeness, we address the constitutionality of the pat-down.

*State v. Johnson*, 2007 WI 32, ¶21, 299 Wis. 2d 675, 729 N.W.2d 182 (citation omitted). On our review of whether the pat-down was constitutional, we determine "[w]hether a reasonably prudent [officer] in the circumstances would be warranted in the belief that [the officer's] safety or that of others was in danger." *Id.* (citation omitted). We "decide on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to effectuate a protective search for weapons in a particular case." *Id.*, ¶22 (citation omitted).

¶24 Our supreme court has recognized that drug-related offenses are "known by law enforcement to be associated with weapons possession." *Id.*, ¶29. In addition to the deputy's knowledge that Roberts was on probation for a drug-related offense, the deputy had observed the van apparently attempting to avoid a marked squad car while driving during nighttime hours, and had observed all three occupants of the van engage in apparently evasive behavior. The deputy also noted signs that Roberts was impaired, and observed a machete in the van. Additionally, the deputy was alone on the scene, and there were three occupants in the van. Those facts, taken together, justified the pat-down for officer safety because, under the totality of the circumstances, the officer had reasonable suspicion to believe that Roberts may have been dangerous and that he had access to a weapon. *See id.*, ¶¶31, 35. We affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5. (2021-22).

10